CHAPMAN et al. v. TROY LAUNDRY CO. et al.

No. 5484.   Decided August 10, 1935.   (47 P. [2d] 1054.)

Rehearing denied January 31, 1936.

*Stewart, Stewart & Carter,* of Salt Lake City, for appellants.

*Irvine, Skeen & Thurman,* of Salt Lake City for respondents.

BATES, District Judge.

This action is brought by the plaintiffs to secure the cancellation of 4,000 shares of stock of the defendant Troy Laundry Company, a corporation, issued under the direction of the defendants Albert Van Cott, F. J. Balli, and William Lake, as directors of that corporation, to the defendant J. S. Van Cott.

The gist of plaintiff's complaint is that the three defendants, in violation of their trust and duties as directors, issued the 4,000 shares of stock to the defendant J. S. Van Cott for the purpose of controlling the affairs of the defendant corporation. There is no allegation in the complaint, neither is there any finding of fact, to the effect that the sale of the stock in question actually gave the said defendants the control of the corporation. Neither is there any evidence of that fact. The findings intended to meet that question are as follows:

"That the primary purpose of the defendants, Albert Van Cott, F. J. Balli and William Lake, acting as directors of the said Troy Laundry

Company, and for and on its behalf, in selling the said 4000 shares of stock to said J. S. Van Cott, which purpose was understood and its accomplishment participated in by J. S. Van Cott, was to gain control of their stock of the Troy Laundry Company to themselves and their associates, and to perpetuate the said Albert Van Cott, F. J. Balli, and William Lake as officers and directors of the said Troy Laundry Company, and the said J. S. Van Cott in the position as manager of the said Troy Laundry Company. At the time of the institution of this action on the 21st of January, 1932, (Three months after the issue of the questioned stock) the individual defendants held in their possession, in addition to the stock issued by them to the defendant, J. S. Van Cott, the proxies of others with whom the defendants had reasonable ground to believe they could rely for support and cooperation to enable the said individual defendants to vote, at the said stockholder's meeting of the Troy Laundry Company to be held on January 21, 1932, the control of all of the issued and outstanding stock of the said Troy Laundry Company. And, thereby enable the defendants, Albert Van Cott, F. J. Balli and William Lake to re-elect and perpetuate themselves as the directors and officers of the said Troy Laundry Company and the said J. S. Van Cott as its manager."

In equity cases the burden is on this court to determine whether the findings of fact are supported by a fair preponderance of the evidence. In doing this it is our duty to give full consideration to the fact that the trial court was privileged to observe the witnesses, their candor and fairness. And if, giving due consideration to these opportunities of the trial court, it can fairly be said that the record justifies the inferences and conclusions reached by the trial court, this court should uphold the findings. Otherwise, it is our duty to make such findings as under the record are just.

It is impossible within the reasonable limits of a decision to refer to all the testimony offered in a prolonged trial such as this was. Neither do we believe such a course necessary in order to arrive at a proper conclusion as to what the findings should be. A brief summary of the evidence offered is sufficient for the purpose.

The following facts are either admitted or are fairly established by the evidence:

Most of the parties to this action have been engaged as workers in the laundry business in Salt Lake City, Utah, and in Provo, Utah, during the greater portion of their lives. The Royal Laundry Company was organized by these parties and some others about the year 1906. Prior to that time some of them had been engaged as laborers by the Troy Laundry Company of Salt Lake City, Utah, not a party in this case. For a great many years these parties worked together as stockholders and directors and operators in various capacities in the Royal Laundry Company and in the defendant Troy Laundry, and in so doing they had been reasonably successful. Good will and mutual confidence seemed to be the outstanding characteristic. Until the year 1931, there was an understanding, quite generally lived up to, to the effect that, if any stock in the Royal Laundry Company was sold by any owner and bought by any of these parties, the stock so bought should be divided pro rata among them.

In the year 1924, these same parties organized the defendant Troy Laundry Company in Provo, with the defendant Albert Van Cott as manager. In the following year, 1925, the defendant J. S. Van Cott, who had for some time been working with the Royal Laundry Company, was employed by the Troy Laundry Company of Provo as assistant manager. From then on and down to the year 1931, J. S. Van Cott was actively engaged as assistant manager of the Troy Laundry in Provo. In 1924, the earnings of the Troy Laundry of Provo were $789.91. Each year while J. S. Van Cott was acting as assistant manager the earnings were substantially increased until the year 1930, when they were $22,820.29. In 1931, the earnings dropped to $16,766.53. In 1924 the net worth of the plant was $12.000. In 1931 it had increased to approximately $77,000. During that period of time dividends had been paid to the stockholders amounting to approximately $70,000. The Troy Laundry Company was organized with an authorized capital of 64,000 shares of the par value of $1 each. This stock was all issued, and there-

after the stockholders returned to the treasury their pro rata share of 24,000 shares for the directors to use in furthering the purposes of the corporation. A majority of the outstanding stock of the Troy Laundry corporation was held by Royal Laundry Company from the date of its organization down to November 12, 1931.

In February, 1931, E. H. Chapman, who was then a stockholder and director in the Royal and Troy Laundries, sold his stock in these companies to the defendant Albert Van Cott. It may be fairly inferred that dissensions were then developing among the stockholders involved in this litigation, because at the time of making that purchase Albert Van Cott told Mr. Chapman that if he bought it would be without "strings" and he would feel free to deal with the stock as he saw fit, to which Mr. Chapman agreed. After Albert Van Cott purchased this stock, he gave the other stockholders an opportunity to participate and the stock was distributed pro rata, with the exception of a very minor amount which was retained by Albert Van Cott in excess of his pro rata share. Director Lake's son was named as a director to succeed Mr. Chapman, and as a result the directors who are defendants in this action were able to control the action of the board of directors of the Royal Laundry.

March 3, 1931, at a meeting of the Troy Laundry directors, it was proposed by Albert Van Cott that the number of the directors of the Troy Laundry be changed from seven to five, and the place of meeting be changed from Provo to Salt Lake. Plaintiff, Mr. Smith, earnestly opposed the suggestion, with the result that the meeting broke up in a row. On the 27th of April, 1931, at a meeting of the board of directors of the Royal Laundry Company, Director Lake was authorized to vote the Troy Laundry stock owned by the Royal Laundry Company at a meeting of the stockholders of the Troy Laundry Company to be held on the 8th of May, 1931. There is some evidence in the record tending to establish that the meeting of April 27 was not regularly called or held, and that the resulting meeting of May 8 of the Troy

Laundry Company was not regularly called or held, and that its action was not binding. But in view of the fact that the purpose of the meeting of the Troy Laundry Company was to change the number of directors to three instead of seven, and in view of the further fact that the plaintiffs are in court alleging and relying upon the fact that from May 8, 1931, and thereafter, the board of directors of Troy Laundry Company was made up of three members, the question of the regularity of the proceedings in the meetings of April 27 and May 8 became largely immaterial. The meeting of the stockholders of Troy Laundry held on May 8, 1931, voted to reduce the number of directors to three and selected the defendants Albert Van Cott, William Lake, and F. J. Balli as the new directors.

During the time that J. S. Van Cott had been the operating manager of the Troy Laundry Company in Provo, he had been acting as an employee only. His salary in 1925 was $35 a week. It was increased from time to time until in October of 1931 it was $75 a week. For some time prior to October, 1931, he had desired to become a stockholder in the Troy Laundry so as to share with the others in the growth of the plant. He had frequently talked with his father, Albert Van Cott, but had not spoken to the other directors until the meeting of the Troy Laundry stockholders on May 8. At that time he talked with the other directors with reference to his becoming a stockholder, and they evinced a willingness for him to do so, but no definite action was taken.

In July of 1931 he went to California to talk with his sister with reference to securing her assistance in establishing another laundry in Provo and proposed if he did that to invite one or two of the other employees of the Troy Laundry Company to join him. His sister agreed to render him that assistance. He was the owner of $3,500 worth of securities, and with them he secured the promise of a Provo bank to assist him in the enterprise. About the 8th of October, 1931, he met with the three directors of the Troy Laundry and informed them that he desired to become a stockholder with

them, and that, in the event he could not accomplish that, it was his purpose to start another laundry and invite some of their employees to join him. The directors all expressed a desire to have him stay with them, and they thereafter issued to him the 4,000 shares in question for $1 a share, which was paid, and entered into a contract with him retaining him as manager for a period of five years at $350 a month. It is that sale the decree of the court has declared fraudulent and ordered set aside on the theory that it was not made in good faith, but for the purpose of retaining the voting control of the corporation and perpetuating the defendant directors and J. S. Van Cott in office. Nothing was said to any of the plaintiff directors by J. S. Van Cott or the other defendants with reference to the demands of J. S. Van Cott or the purpose of the directors to issue the stock, neither before nor after the transaction, until about the time of the directors' meeting of the Troy Laundry in January, 1932.

In July, 1931, the plaintiff directors contracted for the purchase of Royal Laundry Company stock that was owned by Waldermar Van Cott, E. L. Sheets, and others sufficient in amount to give the plaintiff directors a majority of the outstanding stock. Because of stock ownership of the Royal in the Troy Laundry, they also had power to dominate the next stockholders' meeting of the Troy Laundry. These stock certificates were not presented for transfer, and nothing was said to the defendant directors with reference to that purchase, with the result that plaintiff directors stood as holding the control of the Royal, and incidentally the Troy, without informing the defendant directors thereof, and the defendant directors had issued the 4,000 shares to J. S. Van Cott without informing the plaintiff directors thereof.

Another laundry known as the National was also being operated in Provo, Utah, as a subsidary of the Troy Laundry. The plaintiff John was managing that laundry with some assistant help. It was not paying. Albert Van Cott requested Mr. John to dismiss the help and operate the laundry alone. This Mr. John refused to do. Some time prior to the

8th of September, Albert Van Cott sent J. S. Van Cott to take control of the National with the information that Mr. John was quitting. Mr. John refused to step out, and told J. S. Van Cott that he would not do so until a written order was sent from Albert Van Cott. Thereafter, Albert Van Cott had a conversation with Mr. John, which conversation Mr. Van Cott reported to the board of directors on the 8th of September, and the following minute entry was entered:

"Mr Van Cott reported that the plan he had worked out to have one man in the National do it all, had been upset by C. W. Chapman going down and telling Mr. John not to quit as he had decided to do, but to stay right on the job as he, Chapman, and others had control now, and their attorney, Mr. Skeen had advised them to tell Mr. John to stay on the job."

There is nothing in the record to indicate with any certainty that either Balli, Lake, or Albert Van Cott knew just who was meant by the expression "we had control," but whether they knew or not there was certainly enough in the report made by Albert Van Cott of his conversation with Mr. John to have put them on guard and to have served notice on them that some one among the stockholders of this company, at least, claimed to have a controlling interest, and that they were acting adversely to the desires of the directors upon the question of the management of the National Laundry.

On the 8th of October, when the 4,000 shares of stock were issued to J. S. Van Cott, the stockownership of the Troy Laundry, not including the 4,000 shares, then stood as follows:

| | | |
|---|---|---|
| Albert Van Cott | $2,620^{12}/_{14}$ | shares |
| William Lake | $1,490^{13}/_{14}$ | shares |
| F. J. Balli | $2,364^{6}/_{14}$ | shares |
| W. F. Lake | $786^{7}/_{14}$ | shares |
| Ruth Lake Lambert | 337 | shares |
| Total | $7,599^{10}/_{14}$ | shares |

(The stock of W. F. Lake and Ruth Lake Lambert is included in this compilation because of plaintiffs' claim that they were children of William Lake and subject to his domination.)

| | | |
|---|---|---|
| C. W. Chapman | $2,364^6/_{14}$ | shares |
| J. T. Smith | $2,364^6/_{14}$ | shares |
| R. Williams | $2,364^6/_{14}$ | shares |
| A. H. John | $3,146$ | shares |
| Total | $10,239^4/_{14}$ | shares |

(These are grouped together because they constitute the plaintiffs in this case.)

The Royal Laundry Co. .......................... $22,161$     shares

By adding the 4,000 shares sold to J. S. Van Cott to the first list they have only a total of $11,599^{10}/_{14}$ shares out of 44,000 then outstanding. The Royal Laundry Company with its 22,161 shares still retained control. At that time plaintiffs claimed ownership or a majority of the stock of the Royal Laundry; that they would be able to control the next stockholders' meeting of the Troy Laundry Corporation, and that the defendants knew of their power to control. Plaintiffs further urge that this situation caused the defendant directors to issue the 4,000 shares to their confederate to retain the control for their own advantage.

Only a day or two after the meeting of the Troy board on the 8th of October when they decided to issue this stock to J. S. Van Cott, the board of directors of the Royal Laundry then made up of the plaintiff, excepting Mr. John, and the defendants, excepting J. S. Van Cott, passed a resolution directing Albert Van Cott to attend a laundry convention to be held in the latter part of October in Louisville, Ky. Mr. Van Cott in going to the convention went by way of Detroit, Mich., where he visited with a Mr. Kilpatrick who was then and for a long time had been, a stockholder in the Royal Laundry Company.

On the 28th day of October, 1931, a letter was written to William Lake, president of Royal Laundry Company, by Joseph H. Primeau, a lawyer in Detroit, Mich., in behalf of Mr. Kilpatrick in which he called attention to the fact that the annual statement shows that the Royal Laundry Company is carrying four items of stock in other companies;

that in purchasing said stock the Royal Laundry Company had acted ultra vires and demanded that the money so used be returned to the treasury and dispensed as a dividend to the stockholders according to their respective holdings. A number of letters and telegrams passed between these parties, and, on the 12th of November, an order of the board of directors of the Royal Laundry Company was entered directing the stock in the Troy and other companies to be distributed to the stockholders of the Royal Company pro rata as a stock dividend. The defendant directors voted for that action. Mr. Kilpatrick accepted and thereby became the owner of 1,846 shares of the Troy Laundry Company stock on the 12th of November, 1931.

The stock ownership of the Troy Laundry Company then stood as follows, and it continued to stand that way until the meeting of the stockholders of the company on the 21st of January, 1932, when this action was started:

| | | |
|---|---|---|
| Albert Van Cott | $5,601^{12}/_{14}$ | shares |
| William Lake | $3,996^{13}/_{14}$ | shares |
| F. J. Balli | $5,276^{6}/_{14}$ | shares |
| W. F. Lake | $1,192^{1}/_{2}$ | shares |
| Ruth Lake Lambert | 337 | shares |
| J. S. Van Cott | 4,000 | shares |
| Total | $20,404^{10}/_{14}$ | shares |
| W. H. Kilpatrick | 1,846 | shares |
| W. R. Pollock | 8 | shares |
| Total | 1,854 | shares |
| C. W. Chapman | $5,276^{6}/_{14}$ | shares |
| J. T. Smith | $5,276^{6}/_{14}$ | shares. |
| R. Williams | $5,276^{6}/_{14}$ | shares |
| A. H. John | 3,146 | shares |
| Gilbert Sheets | 2,766 | shares |
| Total | $21,741^{4}/_{14}$ | shares |

The stock of Ruth Lake Lambert and W. F. Lake are again included in the foregoing tabulation with the stock owned by the defendants because of the claim of their being children

of William Lake and subject to his domination, but by including them they have insufficient to give them the control of the Troy Laundry, and they did not have the control excepting with the addition of the stock owned by Mr. Kilpatrick. On the day of the stockholders' meeting of the Troy Laundry, January 21, Mr. Kilpatrick sent his proxies by telegraph to William Lake to vote at that meeting. Mr. Pollock on that date also gave his proxy to Mr. Lake to vote at that meeting.

During Mr. Van Cott's visit with Mr. Kilpatrick, they talked with reference to the Royal Laundry business, but there is no evidence in the record to justify a conclusion that Van Cott talked with Mr. Kilpatrick about the control of the Troy or any changes that were being made in its management or with reference to his son being employed there, or upon any other subject that could in any way indicate that Mr. Kilpatrick became a party knowingly or otherwise to any scheme or plan on the part of Mr. Van Cott to retain control of the Troy Laundry.

It is not questioned that Mr. Kilpatrick was correct, when on the 28th day of October his attorney wrote the Royal Laundry that their acts were ultra vires in using the company's money to buy stock in other corporations. There is nothing in the record tending to establish that that letter was written because of any suggestions of Albert Van Cott, unless it may be inferred from the fact that the letter was written at about the time that Mr. Van Cott visited with Mr. Kilpatrick.

It is the theory of plaintiffs that Kilpatrick became either the ally or the tool of Van Cott. The quality of the evidence relied on by counsel for plaintiff to establish this fact is illustrated by the following excerpt of the cross-examination of Mr. Albert Van Cott, relative to his visit with Mr. Kilpatrick:

"Q. Mr. Van Cott, when you went back there to Detroit, of course at that time you had made the sale to your son of 4,000 shares of stock, had you not? A. Yes.

"Q. And you knew that, of course? A. Yes.

"Q. Did you talk to him (referring to Kilpatrick) about that matter? A. I don't believe so. I am not sure, but I don't think I did.

"Q. Did you talk to him about any of the factions in the company? A. No, nothing in particular.

"Q. Was he interested in the affairs of the company? A. Is he?

"Q. Was he when you went back there? A. Yes.

"Q. Did you talk to him about Mr. Chapman having the control of the Royal Laundry Stock? A. I might have told him about this conversation in the minutes there, but I am not sure as to whether I did or not.

"Q. But you don't remember discussing with him the fact that you had made a sale of 4,000 shares of stock of the Troy Laundry Company to your son? A. Well, I don't know whether I did or not, I hardly think so.

"Q. Did you talk to him at all? A. Because he was, as I have testified, he wasn't a stockholder there, and I don't remember whether I thought it was of any concern, or not.

"Q. Did you talk to him at all about anything that might be coming up in the future as to relating to control? A. Well, I couldn't tell you, I might have, but our discussions were more about the automobile business. That is his hobby and he was showing me around, and that is what we talked about generally." Respondents' brief, pp. 41-42.

It may fairly be inferred from the record that the stockholders of the Troy Laundry Company were divided into two camps in the early part of the year 1931; that throughout the year the division became more definite, and that the Chapman interests on the one side were just as anxious to secure the control of the corporation for their own interests as the Van Cotts were to secure control for their interests. It is urged by plaintiffs that the defendants were acting on the advice of counsel to secure the control for their own benefit. The plaintiffs were also acting on the advice of counsel for the same purposes.

The plaintiffs complain that the defendants acted in secret in selling to J. S. Van Cott, but plaintiffs did the same thing in making their purchase. That plaintiffs in purchasing the stock control were seeking to further their own interests is conclusively evidenced by the fact that having secured the right to vote a majority of the stock when the proper time

came, on the advice of counsel they proceeded to interfere with the management of the business by those legally placed in control. Plaintiffs' evidence establishes that plaintiff Chapman told plaintiff John that they had control, for him to stay on the job in the National Laundry, and to ignore the action of the duly elected manager. This evidence goes to the conduct of the parties with reference to the Royal Laundry and not to the Troy, but throughout the entire case, and throughout the operation of these concerns, the interests have been so blended as to make it impossible to separate them when searching for motives that induced actions by the parties.

We are not impressed with the purity of plaintiffs' conduct. While they may have been within the letter of the law in whatever they did, still we are almost forced to the conclusion that they were not particularly concerned about an honest administration of the affairs of the corporation in the interest of all the stockholders. Plaintiffs rely very sincerely upon the doctrines announced in the case from Wisconsin entitled *Luther* v. *C. J. Luther Co.*, 118 Wis. 112, 94 N. W. 69, 72, 99 Am. St. Rep. 977. That is a case where suspicion and dissension developed between factions rivaling each other for the control of the corporation. C. J. Luther had turned certain patent rights into the corporation. As time went on, modifications were made by other directors, and stockholders attempted to so manipulate as to give them a power of control, and Mr. Luther, being a director, formed an outside partnership for competitive purposes. The board of directors controlled by the factions opposing Mr. Luther, because they believed Mr. Luther ought not be in control, sold treasury stock to a confederate, and Mr. Luther and other stockholders sued to have the stock so issued canceled. Under these conditions, the court, in commenting upon the fundamental proposition that people seeking relief in a court of equity must come in with clean hands, used the following language:

"Were Clarence J. Luther the sole plaintiff, we should have little doubt that he ought to be dismissed from a court of equity without relief, for the reason that his own conduct has been so in outrage of his duties as a director and officer of the corporation that no court can patiently listen to his prayer for enforcement of fiduciary principles and duties. That objection does not, however, exist to some of the other plaintiffs, who, as stockholders, ask that their rights be protected as to them. The circuit court has found, and we find, nothing of misconduct in their relations to the company."

There is no good reason why a court of equity should lend assistance to one group of stockholders who have demonstrated a desire to control for selfish purposes as against another group who may be retaining control for the same reasons.

So far as the record discloses, there was nothing on the 8th of October to suggest any probability of change in the stock ownership of either of these corporations that could have operated with the sale of the 4,000 shares to give the defendants the control of Troy. Plaintiffs then had a majority of the outstanding stock of both corporations under their control and could at the next stockholders' meeting take control of the directorate of both corporations. Plaintiffs do not contend otherwise, but they rely on subsequent developments to find support for their claim that the sale was for the fraudulent purpose of gaining control. Their position is well stated in the following quotation from their brief on appeal:

"Counsel, under Assignment No. 34, complains at the evidence introduced, showing the visit of Albert Van Cott to Kilpatrick in Detroit. We submit that this evidence was properly admitted and conclusively shows not only that the three defendants named here, cooperated together in voting their own stock, but were procuring by some representation, which is not material, the cooperation of Kilpatrick and others who, under the evidence above discussed, at the crucial time when they were needed, delivered proxies to Wm. Lake to vote sufficient stock, with the fraudulently issued stock, to control the vote in this election. The only reason we can see for Counsel's complaining at that, is that when Albert Van Cott was called at the outset of the trial of the case and compelled to produce the proxies that

were delivered and used in asserting the control, and reelecting these three men as directors, he testified that there were no proxies. (Tr. 156 Ab. 37.) These proxies, with the Primeau—Kilpatrick letters, conclusively proved the allegations, and, in common language, the defendants were caught red-handed with the goods on them which they proposed to use at the annual stockholders' meeting, and, but for the injunction, would have used, in violation of their duties as directors, and the rights of these defendants as majority stockholders. We submit that Counsel's argument under Assignment No. 34 but emphasizes the completeness of the plan, scheme and conspiracy of the defendants and the frustration of their purpose by the injunction. Counsel's main struggle for justification is apparent in the following statement quoted from page 82 of his brief:

" 'As we have already pointed out, there is not one word of evidence that even suggests that appellants exercised any control over the Kilpatrick stock, which was essential to stock control by the appellants.'

"What about the trip of Van Cott to Detroit, leaving here the day or the day after the 4,000 shares of stock were issued to J. S. Van Cott, the testimony that they talked about the automobile business and only generally about the laundry business, the letter of Kilpatrick's attorney to the Royal Laundry Company (Tr. 858, Ab. 202) and the persistent follow-up by letters or wires (Tr. 859-60-61, Ab. 203-4-5-6) until the purpose of Albert Van Cott and these other defendants in distributing the Troy Laundry Company stock among them had been accomplished, and finally the receipt, on the very day of the meeting, by defendant, Wm. Lake, of the Kilpatrick proxy (Exhibit G) which, by Counsel's statement above quoted, was necessary for the defendants to have in order to vote the control? In view of the above quoted statement, we should like counsel's further explanation of this cooperation.

"We think the foregoing fully answers Counsel's argument under Assignment of Error No. 35. The testimony of all of the defendants that they had no agreement with Kilpatrick to vote his stock is, of course, illustrative of the limits to which the defendants and counsel would go in seeking to build up a justification. The Kilpatrick proxy itself (Exhibit G) which reads as follows:

" 'KH12 58 7 Extra Detroit Mich Jan 21 310P

William Lake Sr. Care R. T. Stewart Loofbourow and Stewart Kearns Bldg

" 'I hereby appoint William Lake Senior my attorney and proxy to attend and represent me at the annual stockholders meeting of the Troy Laundry of Provo and at any adjourned meeting of the

same and to vote my eighteen forty six shares of stock of the Troy Laundry Company of Provo.

       " 'W. H. Kilpatrick,
       " '8162 East Jefferson Ave.'

"and which the evidence shows came into the hands of Wm. Lake on the date of the meeting, and the close cooperation of the defendants, in reducing the number of directors of the Troy Laundry Company, reelecting a Board of Directors and in the employment of J. S. Van Cott as manager, with knowledge of the factional dispute, justifies the inferences and fully supports the finding complained of." Respondents' brief, page 76.

In another part of their brief counsel say, in referring to the Kilpatrick proxy being in the hands of the defendants on the 21st of January, 1932, at the annual stockholders' meeting, "the proof of the pudding is in the eating," and artfully argue that because Mr. Kilpatrick telegraphed his proxy to Lake on the day of the meeting there must have been some kind of understanding that he would do so or some state of facts that led Van Cott to believe he would do so on the 8th of October. If we assume that there was bad faith in the minds of the directors on the 8th, then it would seem to follow that they must have, for some reason, relied on Kilpatrick. But to assume the fact is to eliminate the necessity for proof. Our assumptions must be to the contrary until proof overcomes them. If we are to indulge in assumptions, it would be just as consistent to assume that Kilpatrick decided to put his proxy in the hands of Lake because he learned from some unknown source that the Chapman faction was attempting to dominate the corporation as to assume that he had become a tool of or a conspirator with Van Cott. Any number of assumptions might just as consistently be drawn.

Unusually able counsel represented plaintiffs in the presentation of their case and knew that Mr. Kilpatrick's part in the drama was highly important. It is peculiar that they would rest their case on the evidence of Mr. Van Cott unless they believed in its accuracy, and yet, having done so, they now ask the court to draw inference upon inference of

ulterior motive, design, and conduct squarely in the face of positive denials on the part of the only witness who testified on that subject. They seemed to rest on the logic of their expression that the proof of the pudding is in the eating.

In support of their argument that evidence such as the foregoing justified the court in drawing the conclusion that the stock was issued to J. S. Van Cott in bad faith to enable them to retain the control of the corporation, ■ notwithstanding that all the affirmative evidence is to the contrary, the following language used by Justice Rugg in the Massachusetts case entitled *Elliott* v. *Baker*, 194 Mass. 518, 80 N. E. 450, 451 is cited:

"This is peculiarly a case for the application of the rule that the court who hears the witnesses has opportunities for testing their reliability and veracity which no appellant tribunal can acquire. It is stated in the memorandum that the court believes, 'though it is denied by all of them that there was some secret understanding or arrangement between Lamson, Foster and Nickerson in regard to the situation. This finding must have been based not alone upon what was said, but upon a scrutiny of the witnesses, inferences drawn from their appearance, and the atmosphere they created in testifying, which cannot be reproduced in a printed report. A careful examination of all the evidence demonstrates, however, that not only was this finding not plainly wrong, but was amply warranted."

But neither that case nor any other that we have examined is authority for the broad proposition that a trial court is justified in basing affirmative findings on negative evidence merely because of the appearances of the witnesses. While the demeanor of the witness in testifying is very important and should be given consideration by the trier of fact, still there must be something more than the batting of an eye, the coloring of the cheek, or the twiddling of the thumbs as a basis for finding facts.

Such course is directly contrary to all the fundamental rules laid down for the guidance of courts in such matters. In volume 6, Jones Commentary on Evidence, page 4888, the rule is laid down as follows:

"The mere fact that the testimony of a witness is not believed does not of itself warrant a finding in direct opposition to such testimony. * * * For example a jury is not warranted in assuming that because they decide the defendant's narrative is false, the converse of such narrative must be true without any further examination of the testimony."

In a Wisconsin case referred to in the same volume and on the same page the rule is stated as follows:

"Disbelief of denials of facts which a party must prove is not the equivalent of affirmative testimony in support of those facts."

The basis of the cause of action is the sale of stock to J. S. Van Cott for the purpose of getting control. That must be found to have been their intention and plan on the 8th of October. The events that followed are not evidential of their purpose at that time, in the absence of evidence showing some connection or relation or that the events were merely the culmination of a scheme developed prior to or at the time of sale. There was nothing wrong or unfair in Mr. Kilpatrick putting his proxy in the hands of Mr. Lake on the day of the meeting; neither was there any reason why Mr. Lake could not have solicited the proxy, and, upon receiving it, use it in such manner as he saw proper to do. In fact, plaintiffs pleaded no such wrong and do not argue anything against the delivering of the proxy on that date, excepting that they draw the conclusion, and urge us to do so, that the delivery of the proxy proves the previous understanding and fraudulent purpose.

To justify a finding that the stock was issued for the purpose of gaining control of the corporation and perpetuating themselves in office, it may not be necessary for the proofs to show that the issuance of the stock then actually gave the conspirators, if such they were, the immediate majority of the outstanding stock, but in the absence of such showing, there must certainly be established a state of facts that would reasonably have suggested to them that by the issuance of the stock in question they would be able to complete their scheme by further manipulation so as to give them the control. But we are unable

to see from a careful reading of the evidence in this case how any reasonable man could have expected to gain the control in the light of the conditions existing at the time of sale as portrayed by the evidence.

Because of the fact that when the sale was made, the stockholders were divided into rival camps, and plaintiffs controlling a majority of the outstanding stock in each corporation, it necessarily follows that they could be in the actual control of both companies within three months after the sale. So far as the evidence discloses no one could reasonably anticipate a change in these conditions. It is going too far to infer from this record that Albert Van Cott when that sale was made anticipated or planned the division of the Troy stock owned by Royal; that as part of that plan he could arrange with Kilpatrick to have his lawyer demand a sale of the stock and a distribution of that cash; that instead of that demand being complied with the stock would be distributed; that when it was distributed he could in safety leave the proxy in the hand of Kilpatrick until the day of election; that when the election was held the proxy would be delivered into his hands; and that thereafter, from time to time as necessity arose, he could constantly depend on Mr. Kilpatrick to stand by him. It is conceivable that such a thought might have been in his mind and that relying on it he advised his son to invest the earnings of his lifetime. But it rests wholly in suspicion and imagination. It is inference based on inference, in series and in reverse.

We are not at liberty to go so far afield in the realm of suspicion and imagination. The burden is on the plaintiff to prove the conspiracy and the motive inducing the action complained of by facts from which the mind may reasonably draw the inference of fraud or unfairness.

It is possible that these parties may have made the move complained of for the purpose of gaining and retaining control even though they could not when the sale was made

see or anticipate what their future course would be or how they would finally accomplish their purpose. If so, the stock should be canceled for the same reasons that would demand a cancellation if the sale had resulted in giving them actual present control. But to do so, in the light of the record before us, is far afield from the common experiences of men.

It is also alleged that the said sale of stock was fraudulently and secretly issued, and without affording to the other stockholders an opportunity to exercise their priority right to purchase treasury stock of the corporation. It is neither alleged nor proved that any stockholder ▮ desired or demanded the right to purchase any stock. For aught that appears in either pleadings or proof, any stockholder desiring to do so could have purchased any portion of the remaining 20,000 shares of stock in the treasury. No authorities are cited by counsel in support of the claim that the stock should be canceled because they were not given their right to purchase, where there is nothing to show that they wanted to purchase, that they would have taken the stock if it had been offered to them or that they have been injured in any way excepting from the view point of the control of the corporation. In the Luther Case, heretofore cited, it appears that the complaining stockholders were themselves desirous of purchasing; and that they resisted the sale, asked leave to, and offered to purchase their share, but that it was denied them squarely upon the ground that it would be contrary to the interests of the company to permit the Luther faction to remain in control. The case was tried and ruled squarely on the proposition that the purpose of the directors was to gain control of the corporation to perpetuate themselves in office, and not upon the ground that any stockholder was deprived of his right to purchase treasury stock.

Allegations and proof also tend to establish that the stock was sold for less than its fair cash value. But the case was ruled on the theory that such allegation and proof was

material only as it tended to establish the motive of selling to gain control and perpetuate themselves in office. Neither in pleadings, judgment, nor argument is the question of value otherwise relied on as supporting the judgment. And they ought not be. In the absence of the fraud relied on, such questions are peculiarly for the board of directors to determine and not for the court.

Plaintiffs recognize the rule of law that makes it the duty of, and authorizes the directors of a corporation to transact the business thereof, and that it is not the right or privilege of a court to set up its judgment as to whether or not the directors of a corporation have acted wisely in its management. Counsel agree that it is the duty of the directors of the corporation to exercise their functions in good faith with a view to promoting the welfare of the corporation, and that if they sell or dispose of the corporate property with a view to gain personal advantage rather than for the purpose of enhancing the interests of the corporation, they are guilty of bad faith. It is the duty of the courts to determine whether or not the directors have acted in good faith with their corporation. If so, then it is the duty of the courts to uphold the actions of the directors, even though it may appear that the things done were in fact not advantageous to the corporation. If the directors of the Troy Laundry Company honestly believed that it was in the best interests of the company to sell a portion of the treasury stock to J. S. Van Cott upon condition that he enter into a long-time contract of employment with them, and that he refrain from setting up a competing business, there is no rule of law to prevent their so doing.

Let us briefly examine the evidence from the viewpoint of the defendants. J. S. Van Cott was a good laundry man and every one interested in this lawsuit knew it. He was a young man who had formed the acquaintance of the numerous customers of the Troy Laundry, and had their confidence. Under his supervision the Troy

Laundry had grown from a business with an income of less than $800 in 1924 to an income in excess of $22,000 in 1930. During that time the assets of the business had been multiplied several times, and many thousands of dollars in dividends had been paid to the stockholders. Quite a number of stockholders during the period of time had been working for the company and had themselves, drawn good salaries. It is apparent that he had proven to be a valuable man to the institution. It is apparent from the evidence that these directors knew that, where employees had withdrawn from other laundries in that vicinity and gone into competing business, material injury was suffered by the company such employees had left. They might well have felt that the welfare of the company required that his services and interest be retained. Such was their testimony. They were informed of the desire of J. S. Van Cott to become interested in this business and of his desire to continue to work with it and build it up if he were permitted to participate in the probable profits of the enterprise, but that if he were denied that privilege he proposed to go into business for himself.

The evidence is all one way to the effect that he frequently talked with his father, Albert Van Cott, with reference to this subject, and that as early as May 8th he talked with the other directors and informed them of his desires and purposes. It is also clear from the record that he went to California to secure financial assistance from his sister; that he interviewed the bank at Provo with a view to being financed in such an enterprise; that he informed the directors of these things, of his ability and intention to establish a competing laundry in Provo and to take with him, if they would go, one or more of the other employees of the company; that information was in the minds of the board of directors of the Troy Laundry Company on the 8th of October when it was determined to sell this stock to their employee. All of the directors insist in all of their evidence that what they did was for the welfare

of the company, and that it was not done for the purpose of securing control. The only things to rebut their testimony are the inferences heretofore discussed that counsel would have us draw.

For the foregoing reason, we are of the opinion that the plaintiff has not established that the defendants issued the stock in question to J. S. Van Cott in bad faith and for the purpose of perpetuating themselves in office by the preponderance of the evidence or by the clear and convincing testimony that is required to establish fraudulent conduct. It follows that the judgment should be reversed, with directions to the lower court to recast its findings to show that the issue of the stock did not give defendants power to control the corporation, and that such was not their purpose; that they acted in good faith for the advancement of the interests of the corporation; and that they did not at the time of the issuance have any understanding with Kilpatrick or any one else by which together with the issuance of the 4,000 shares they could finally come into the control of the corporation.

Costs to appellants.

ELIAS HANSEN, C. J., FOLLAND and EPHRAIM HANSON, JJ., and LESTER A. WADE, District Judge concur.

MOFFAT and WOLFE, JJ., being disqualified, did not participate.