2009 UT 64

**Samuel R. McLAUGHLIN and John Does 1–10, Plaintiffs and Appellants,**

v.

**Greg SCHENCK, Estate of Boyd Schenck, Anna Schenck, Cookietree, Inc., a Utah corporation, Harold Rosemann, and Gayle Schenck, Defendants and Appellees.**

No. 20070688.

Supreme Court of Utah.

Oct. 2, 2009.

Lincoln W. Hobbs, Margaret H. Olson, Salt Lake City, for plaintiffs.

Matthew M. Durham, Justin B. Palmer, George M. Haley, Richard D. Flint, Salt Lake City, for defendants.

## INTRODUCTION

DURHAM, Chief Justice:

¶ 1 In a public corporation, directors and officers owe the corporation and the shareholders collectively a duty to act in good faith and in the best interest of the corporation. In a partnership, each partner owes each of the other partners individually a duty to act with the utmost good faith. The appellant in this case, Samuel R. McLaughlin, a minority shareholder in a closely held corporation, asks this court to impose on shareholders in such corporations a duty to individual shareholders similar to the duty owed in a partnership. McLaughlin also asks us to reverse the district court's holding that waivers of a provision of this closely held corporation's shareholder agreement were valid, and reverse its order denying amendments to McLaughlin's complaint. We hold that the appellee Greg Schenck, as a close corporation shareholder, owed McLaughlin individually a duty to act in the utmost good faith, but that he did not violate this duty because his actions did not thwart McLaughlin's reasonable expectations. Additionally, we hold that waivers executed by the board and the shareholders of the corporation were contaminated by a conflict of interest, and we therefore remand for a determination of whether the waivers were fair. Finally, we hold that the district court did not abuse its discretion in denying McLaughlin's motion to amend by finding that the amendment would be futile.

## BACKGROUND

¶ 2 Because the trial court dismissed this case on summary judgment, "we review the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party," in this case, McLaughlin. *GLFP, Ltd. v. CL Mgmt., Ltd.*, 2007 UT App 131, ¶ 5, 163 P.3d 636.

¶ 3 Cookietree, Inc. is a privately held Utah corporation that produces and retails baked goods. The company was formed in 1981, with Greg Schenck and his father, Boyd Schenck, among the original shareholders. Greg Schenck was named president at the corporation's founding. He currently holds the same position. In 1992, Greg Schenck recruited Sam McLaughlin to work as the operations leader for Cookietree. McLaughlin's previous experience at Pillsbury and Quaker Oats made him a valuable employee, and he was quickly promoted to vice president of operations and then chief operating officer and vice president of operations. As he invested more of his career in Cookietree, McLaughlin also invested his personal finances in the corporation by slowly purchasing increasing amounts of shares in the corporation.

¶ 4 As part of his agreement to join Cookietree as an employee, McLaughlin and the company agreed to certain terms, which were memorialized in an employment agreement. This agreement guaranteed McLaughlin a minimum salary that was supplemented with a bonus formula. It also provided him with the option of acquiring up to 200,000 shares of common stock in the company. Importantly, under the agreement, McLaughlin was an at-will employee. Thus, either party could terminate the employment relationship at any time so long as six-months notice was given.

¶5 In 1993, Cookietree and McLaughlin entered into an Incentive Stock Option Agreement that allowed McLaughlin to purchase an additional 200,000 shares of the company's common stock. This agreement also required McLaughlin to agree to a 1991 Shareholder Agreement. The 1991 Shareholder Agreement limited the ability of shareholders to sell, assign, or pledge their common stock. Under the agreement, selling shareholders had to first offer their shares, by written notice, to the corporation. If Cookietree did not elect to purchase any or all of the shares, the secretary of Cookietree was required to provide written notice to all shareholders identifying the number of shares available for purchase. Each shareholder was then entitled to purchase a portion of the shares equal to his or her ownership percentage of the outstanding common stock. If, at the close of the applicable option periods, not all available shares had been purchased, the selling shareholder could then sell the shares elsewhere. The agreement also provided that written consent from either the board of directors or the owners of at least two-thirds of the shares (excluding the shares owned by the selling shareholder) could waive the agreement's restrictions on share transfers. The 1991 Shareholder Agreement was replaced in 1999 with a new shareholder agreement, which contained the same terms.

¶6 In 1998, the majority shareholder of Cookietree, Boyd Schenck, passed away. Just before his death he transferred 818,000 shares to Greg Schenck.[1] Following this transfer Greg Schenck owned around 49 percent of Cookietree, with Boyd Schenck retaining around ten percent (545,200) of the company's shares. After Boyd's death, Boyd's wife, Anna,[2] sold Greg Schenck 545,200 shares, making Greg Schenck the majority shareholder, with about sixty-five percent of the company's stock. This transfer was not recorded in Cookietree's minutes or written records, and a right of first refusal was not provided to the corporation or the other shareholders. Stock certificates were nonetheless issued. At the time this transfer was made, it violated the 1991 Shareholder Agreement.

¶7 In 2003, Greg Schenck indicated that he was interested in selling Cookietree. McLaughlin wanted to purchase the company and sent a letter of intent, which conveyed this interest to Cookietree and its president, Greg Schenck. McLaughlin, however, was never able to raise the full amount of the purchase price. During this period, Greg Schenck began discussions with another cookie company, Otis Spunkmeyer, which was interested as a strategic buyer in purchasing Cookietree.

¶8 At this point, the relationship between McLaughlin and Greg Schenck, which previously had been not only professional but also personal and social, began to deteriorate. McLaughlin would not agree to various terms of the Otis Spunkmeyer transaction, including consent to a noncompete agreement. About this same time, McLaughlin learned of the prior stock transfer between Anna Schenck and Greg Schenck. During the discussions with Otis Spunkmeyer, McLaughlin insisted on his right of first refusal for any sold and transferred stock. McLaughlin was thereafter excluded from executive meetings. McLaughlin alleges that after he asserted his right to a bonus on the asset sale of Cookietree to Otis Spunkmeyer, Greg Schenck and Otis Spunkmeyer officers negotiated to instead structure the sale as a stock sale. McLaughlin continued to demand his right of first refusal and requested documentation regarding Anna Schenck's stock sale to Greg Schenck.

¶9 On August 4, 2004, Harold Rosemann, board member and chief financial officer for Cookietree, instructed Kim McLaughlin, McLaughlin's wife and also an employee of Cookietree, to tell McLaughlin to withdraw his claims or "there's going to be some organizational changes around here." On Au-

---

1. This transaction was not subject to the right of refusal provisions of the shareholder agreement because it was a transfer between immediate family members, which was allowed under the 1991 Shareholder Agreement.

2. The parties disagree on whether Boyd's estate or Anna transferred the shares to Greg Schenck. The district court indicated in its order that Anna transferred the shares to Greg Schenck. We rely on this implicit factual finding.

gust 17, 2004, as a shareholder, McLaughlin made an additional request for information regarding the Schenck stock transaction. That same day Greg Schenck confronted McLaughlin and fired him. His notice of termination indicated that it was without cause. Pursuant to McLaughlin's employment agreement, the termination date was not effective for six months. Thus, McLaughlin continued to receive his salary and bonuses for six months, although this compensation was paid at his original contract rate rather than his current salary and bonus rate. McLaughlin was immediately relieved of all duties, blocked from company email, and excluded from the corporate premises. When McLaughlin refused to leave, police escorted him from the property. After McLaughlin's termination, Cookietree contacted McLaughlin's lawyer and indicated that "everything [was] negotiable; [they] were looking for a global resolution." Following his termination McLaughlin continued to receive dividends from his Cookietree holdings. This income, along with his wife's stock dividends, comprised half of their family's income. Kim McLaughlin continued to work at Cookietree for some time after McLaughlin's termination.

¶ 10 In November 2004, McLaughlin sued Cookietree and Greg Schenck for breach of contract and breach of fiduciary duty based on Greg Schenck's stock acquisition. In March 2005, McLaughlin filed another suit against Cookietree and Greg Schenck for breach of contract and breach of fiduciary duty based on McLaughlin's termination. McLaughlin also filed a derivative action. All three cases were then consolidated in the district court. The district court referred McLaughlin's claims relating to his employment contract to arbitration. McLaughlin was awarded damages for Cookietree's breach of an implied duty of good faith and fair dealing for paying the 1992 contract salary rate for McLaughlin's severance pay rather than his most recent salary and bonus rate. The arbitrator dismissed all other contract claims and deferred to the district court to resolve the breach of fiduciary duty claim relating to the termination.

¶ 11 In May 2005 during an unnoticed meeting, Cookietree's board of directors—Greg Schenck; his wife, Gayle Schenck; and Harold Rosemann—ratified the 1999 stock transaction by waiving the corporation's right of refusal. Around the same time, Greg Schenck contacted Jerry Smekal, a Cookietree shareholder, and requested that he also sign a consent and waiver ratifying the 1999 transaction. Smekal, who held 529,000 shares, agreed to sign the form. Additionally, Greg Schenck and Harold Rosemann also signed the shareholder consent and waiver forms, representing 2,181,200 and 316,000 respectively, or nearly ninety percent, of Cookietree's shares.

¶ 12 Cookietree moved to dismiss McLaughlin's claims on summary judgment. The district court granted the motion and dismissed all pending claims, finding that Greg Schenck did not owe any fiduciary duty to McLaughlin with respect to the "dealings related to McLaughlin in his role as an employee" and that Cookietree, not Greg Schenck, terminated McLaughlin from his employment. Additionally, with respect to the stock transaction, the district court found that "all of the actions taken by both Cookietree and Mr. Schenck were within the terms of the [1991 shareholder] agreement and, to the extent certain corporate actions were not undertaken at the time of the sale, the 2005 waiver and ratification actions were effective as a matter of law." With these findings, the district court held that it was "unable to identify any factual claim . . . that would give rise to a claim for breach of fiduciary duty," and thus dismissed all claims, but left McLaughlin with the option to "come forward with facts and evidence that would support a breach of fiduciary duty claim that has not already been addressed." Shortly thereafter, McLaughlin moved for permission to amend his complaint by adding Gayle Schenck and Harold Rosemann as additional parties. The basis for his breach of fiduciary duty claims largely remained the same. The district court denied this motion holding that an amendment would be futile because McLaughlin failed to identify any evidence that was not addressed by the summary judgment. McLaughlin appealed the district court's final order. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j) (2008).

## ISSUES AND STANDARD OF REVIEW

¶ 13 McLaughlin asks this court to review the district court's grant of summary judgment to the defendants on three grounds. First, McLaughlin asks the court to determine whether Cookietree shareholders owed McLaughlin fiduciary duties individually, and if so whether any such duty was violated. Second, McLaughlin requests that we review whether the board's and shareholders' 2005 ratifications were "valid and effective." Finally, McLaughlin argues the district court abused its discretion in denying McLaughlin's motion to amend his complaint.

¶ 14 Summary judgment "is appropriate only in the absence of any genuine issue of material fact and where the moving party is entitled to judgment as a matter of law." *S. Utah Wilderness Alliance v. Automated Geographic Reference Ctr.*, 2008 UT 88, ¶ 12, 200 P.3d 643. Accordingly, when "reviewing a district court's grant of summary judgment, we review the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Id.* As to the underlying determinations, we review legal questions, such as the scope of a shareholder's fiduciary duty and the validity of share transfers under the shareholder agreement, for correctness. We review a district court's decision to deny a plaintiff's motion to amend its complaint for abuse of discretion. *See Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 15, 134 P.3d 1122. We note, however, that this discretion is not unlimited. *Aurora Credit Servs., Inc. v. Liberty W. Dev., Inc.*, 970 P.2d 1273, 1281–82 (Utah 1998).

## ANALYSIS

I.  SHAREHOLDERS IN CLOSELY HELD CORPORATIONS OWE EACH OTHER ENHANCED FIDUCIARY DUTIES, BUT SCHENCK DID NOT VIOLATE ANY DUTY OWED TO MCLAUGHLIN

¶ 15 This case presents the question of whether shareholders of closely held cor-

porations[3]—also commonly known as close corporations—should be treated differently than shareholders of publicly traded corporations when applying the provisions of the Utah Revised Business Corporation Act (the Corporation Act), Utah Code Ann. §§ 16–10a–101 to –1705 (2005 & Supp. 2008), and the accompanying interpretive and common law case law. We previously acknowledged that in close corporations it is "unlikely that there is a disinterested board," *Aurora Credit Servs., Inc. v. Liberty W. Dev., Inc.*, 970 P.2d 1273, 1280 (Utah 1998), and that such corporations are more vulnerable to malfeasance because of the overlapping identity of board members and majority shareholders. *Angel Investors, LLC v. Garrity*, 2009 UT 40, ¶ 21, 216 P.3d 944. For these reasons, we have treated close corporations differently by allowing shareholders in these corporations to proceed as a class of one in derivative actions. *Id.* ¶ 22. We also have allowed close corporation shareholders to proceed both derivatively and directly against corporate officers for breaches of duties owed to the corporation and to minority shareholders. *Aurora Credit Servs., Inc.*, 970 P.2d at 1280–81. In this case we now consider whether the duties owed by shareholders differ in closely held corporations and publicly traded corporations, and if so, whether these duties were breached on those facts.

### A. The Fiduciary Duty of Shareholders in Closely Held Corporations Is Similar to the Duty of Partners in a Partnership

¶ 16 Under the revised business code, directors and officers are required to carry out their corporate duties in good faith, with prudent care, and in the best interest of the corporation. Utah Code Ann. § 16–10a–840 (2005). These corporate duties have been interpreted to coincide with the common law understanding that officers and directors owe these duties to the corporation and shareholders collectively, not individually. *Aurora*

---

**3.** In Utah, we consider a closely held corporation to be a company in which there is " '(1) a small number of shareholders; (2) no ready market for corporate stock; and (3) active shareholder participation in the business.' " *Angel Investors, LLC v. Garrity*, 2009 UT 40, ¶ 21, 216 P.3d 944 (quoting *Dansie v. City of Herriman*, 2006 UT 23, ¶ 17, 134 P.3d 1139).

*Credit Servs.*, 970 P.2d at 1280 (indicating that actions for breach of a fiduciary duty generally belong to the corporation). In this case, however, McLaughlin urges us to apply a different standard—the partnership standard. In contrast to the general standard for corporate duties, the statutory partnership standard of care has been interpreted to require the utmost good faith between individual partners. *Ong, Int'l (U.S.A.), Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 453–54 (Utah 1993) ("Normally partners 'occupy a fiduciary relationship and must deal with each other in the utmost good faith.'" (quoting *Burke v. Farrell*, 656 P.2d 1015, 1017 (Utah 1982))); *Nelson v. Matsch*, 38 Utah 122, 110 P. 865, 868 (1910) ("[P]artners stand in a fiduciary relation to each other, and that[ ]is the duty of each partner to observe the utmost good faith towards his copartners in all dealings and transactions that come within the scope of the partnership business."); Utah Code Ann. § 48–1–18 (2007).

¶ 17 Whether to modify the fiduciary duty standard in closely held corporations is an issue of first impression for this court. Numerous other states have considered the question, and; we look to their analyses and to the Corporation Act's language and structure to guide our determination. *See Arndt v. First Interstate Bank of Utah, N.A.*, 1999 UT 91, ¶ 17, 991 P.2d 584 (indicating that in the absence of Utah precedent, the court looks to Utah statutes and "case law from other jurisdictions for guidance").

¶ 18 McLaughlin urges us to follow the partnership-like duty standard originally articulated by Massachusetts courts and subsequently adopted by several other states. Beginning with *Donahue v. Rodd Electrotype Co. of New England*, 367 Mass. 578, 328 N.E.2d 505 (1975), Massachusetts changed the landscape of duties owed by shareholders in close corporations. Relying on (1) the resemblance between close corporations and partnerships, (2) the need for trust and confidence in such companies, and (3) the inherent risk of loss due to shareholders' inability to recoup their investments, the Massachusetts court imposed on close corporation shareholders the same duties owed by partners— utmost good faith and loyalty to all share-

holders of the corporation. *Id.* at 515. Compared to the fiduciary duty owed by directors and stockholders of public corporations, the court found this duty to be "more rigorous" than the "somewhat less stringent" corporate duty of "good faith and inherent fairness." *Id.* at 515–16. The *Donahue* court explained, "stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Id.* at 515. The Massachusetts courts have repeatedly upheld and applied this standard. *See O'Brien v. Pearson*, 449 Mass. 377, 868 N.E.2d 118, 124 (2007); *Zimmerman v. Bogoff*, 402 Mass. 650, 524 N.E.2d 849, 853 (1988); *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657, 663 (1976). The *Donahue* standard has also been adopted by other jurisdictions. *Hollis v. Hill*, 232 F.3d 460, 468 (5th Cir.2000) (noting that *Donahue's* "recognition of special rules of fiduciary duty applicable to close corporations has gained widespread acceptance."); *Orchard v. Covelli*, 590 F.Supp. 1548, 1559 (W.D.Pa.1984). ("The duty of utmost good faith and loyalty in the context of closely[ ]held corporations has been recognized by a number of courts confronting similar fact situations.").

¶ 19 The defendants, however, urge this court to follow the minority position, which has been adopted by Delaware and Texas. The minority position narrowly construes the duties of shareholders in a closely held corporation and differentiates between a person's status as employee and shareholder. In *Riblet Products Corp. v. Nagy*, for example, the Delaware Supreme Court noted that Delaware had not adopted Massachusetts' approach to fiduciary duties, but instead imposed identical duties on shareholders of closely held corporations and public corporations. 683 A.2d 37, 39 n. 2 (Del.1996); *accord Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex.App.1997) ("[A] co-shareholder in a closely held corporation does not as a matter of law owe a fiduciary duty to his co-shareholder."). Additionally, the Delaware Supreme Court distinguished between the

plaintiff's rights as a stockholder and his contractual rights as an employee. *Riblet Prods. Corp.*, 683 A.2d at 40. While the court noted the *Riblet* plaintiff had not alleged that his termination amounted to a wrongful freeze-out of his stock interest, in subsequent cases where the plaintiff has made such allegations, other courts following Delaware's approach have determined that any injury caused by a termination decision would only be an injury to an individual's employment interests and not to his interests as a stockholder. *Berman v. Physical Med. Assocs., Ltd.*, 225 F.3d 429, 433 (4th Cir. 2000). At least one court has described this approach as being more predictable because it treats all corporations the same way. *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 383–84 (7th Cir.1990) (comparing Ohio's *Donahue* fiduciary duty standard for close corporations to Delaware's traditional standard). The Delaware approach thus stands in sharp contrast to the fiduciary duty standard followed by the majority of states.

¶ 20 Presented with two divergent approaches, we must assess which approach best suits Utah's corporate law scheme. Our Corporation Act does not provide explicit guidance, as it does not directly address close corporations or duties between shareholders. However, considering the Act as a whole and its specific provisions together, such as the duties imposed on directors and the dissolution remedy explicitly outlined, Utah Code Ann. §§ 16–10a–840, –1430(b), we believe it is apparent that the legislature intended to protect shareholders from oppression and misconduct by those in control. To construe the Act's provisions to require the same fiduciary duties for publicly held and closely held corporate shareholders would not adequately protect close corporation shareholders. This is because the Model Business Code, on which the Utah Corporation Act was based, was developed largely in the context of publicly held corporations and the common law surrounding their governance. *See* Model Bus. Corp. Act Ann. Introduction (2009) ("[T]he Model Act does not generally distinguish between publicly held and privately held corporations." Additionally, the Model Act "was amended in 1990 and 2006" to provide greater certainty and more flexibility to non-public corporations.); *See also* F. Hodge O'Neal, Robert B. Thompson, & Blake Thompson, O'Neal & Thompson's Close Corporations and LLCs: Law and Practice § 9:21 (3d ed. 2004) ("Courts recognize that the usual default rules of corporate law affect close corporations differently from large publicly held corporations...."). Close corporations differ, however, in significant ways, and when these differences result in undesired outcomes, we have interpreted the Corporation Act in a way that achieves the intent and goal of the Act as a whole. This is a trend followed by many courts. *See Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 990 (Ind.1998) ("Courts have traditionally interpreted fiduciary duties differently for closely[ ]held corporations as opposed to publicly held corporations for which most of the statutory norms were established.").

¶ 21 As discussed in *Angel Investors* and *Aurora*, the form of closely held corporations subjects shareholders to distinct challenges in protecting their investment. These core characteristics, and other common elements, lead to what has been referred to as the close corporation trap. James M. Van Vliet, Jr. & Mark D. Snider, *The Evolving Fiduciary Duty Solution for Shareholders Caught in a Closely Held Corporation Trap*, 18 N. Ill. U.L.Rev. 239, 242 (1998); *see also* F. Hodge O'Neil, Robert B. Thompson, & Blake Thompson, O'Neal and Thompson's Close Corporations and LLCs: Law and Practice § 9:2 (3d ed. 2004) (noting that a close corporation shareholder "does not have a partner's power to dissolve the enterprise and get out" and similarly does not have the "exit option" of selling her shares in a securities market available to shareholders of publicly held corporations). Shareholders in close corporations lack a ready market for their shares. This means that closely held corporation shareholders have no liquidity in their shares, *see Donahue*, 328 N.E.2d at 515 ("No outsider would knowingly assume the position of the disadvantaged minority."), and have no avenue for price discovery other than the costly process of acquiring an independent valuation for the company. Without an available market in which to sell their

interest in a company, minority shareholders who disagree with the direction or governance of the close corporation must rely on contractual or statutory remedies, which are often nonexistent, impractical, or inadequate. *Id.* This, in effect, leaves the shareholder with no remedy for the abuses and oppression that may result due to the small number of shareholders, the frequency of familial and other personal relationships, and the likelihood that majority shareholders control the board in close corporations. Though the Act provides for dissolution, this is often a drastic remedy that may not serve the interest of the complaining shareholder and certainly not the corporation of which he is a part owner.

¶ 22 Without a market remedy, shareholders in close corporations are easily subjected to freeze outs, squeeze outs, and other forms of oppression, which the Corporation Act aims to prevent. Thus, the Massachusetts approach of recognizing broader fiduciary duties in closely held corporations better achieves the goals of the Act by stemming shareholder oppression and is the appropriate standard for evaluating fiduciary relationships among shareholders in a closely held corporation. Our adoption of the Massachusetts standard is a logical extension of our existing case law regarding close corporations, which acknowledges the unique nature of such corporations and seeks to protect their shareholders by interpreting the Corporation Act with different corporate circumstances in mind. By adopting this broader fiduciary obligation for close corporation shareholders, alternative remedies exist for oppressed shareholders,[4] such as an equitable claim for dissolution or a claim for breach of fiduciary duty.

¶ 23 Having concluded that shareholders in closely held corporations owe their coshare-holders fiduciary obligations, we now consider whether the Defendants breached these duties in this case.

## B. A Shareholder Violates His Duty of Utmost Good Faith When He Thwarts Another Shareholder's Reasonable Expectations of Benefits Derived From Ownership in the Corporation

¶ 24 Breaches of the fiduciary duty owed by close corporation shareholders arise in several circumstances, the facts of which commonly overlap. These circumstances have been identified as unequal treatment, frustration of reasonable expectations of involvement, and a freezeout or squeezeout. James M. Van Vliet, Jr. & Mark D. Snider, *The Evolving Fiduciary Duty Solution for Shareholders Caught in a Closely Held Corporation Trap*, 18 N. Ill. U.L.Rev. 239, 252 (1998). In all cases there is a common element—a shareholder's investment expectation in a close corporation is frustrated by another shareholder's actions. *Brodie v. Jordan*, 447 Mass. 866, 857 N.E.2d 1076, 1079–80 (2006) (noting that examples of breaches of duty share the common element of majority shareholders frustrating minority shareholders' reasonable expectation of benefit from their ownership of shares); Douglas K. Moll, *Shareholder Oppression v. Employment At Will in the Close Corporation: The Investment Model Solution*, 1999 U. Ill. L.Rev. 517, 520–21 (1999) (arguing that investment model "reconciles the doctrines of shareholder oppression and employment at will"); James M. Van Vliet, Jr. & Mark D. Snider, *The Evolving Fiduciary Duty Solution for Shareholders Caught in a Closely Held Corporation Trap*, 18 N. Ill. U.L.Rev. 239, 252 (1998).

---

**4.** At the time *Donahue* was decided, Massachusetts did not have a statutory remedy for oppression. Many of the states that have followed suit have enacted minority oppression statutory remedies—usually dissolution—but allow distinct actions for breaches of the *Donahue* duties. *See e.g., Walta v. Gallegos Law Firm, P.C.*, 131 N.M. 544, 40 P.3d 449, 457 (Ct.App.2001) ("[D]rawing on our partnership case law, we hold that breach of this fiduciary duty can be asserted as an individual claim separate from the remedies available under our statutory corporate law for oppressive conduct."); *Balvik v. Sylvester*, 411 N.W.2d 383, 388–89 (N.D.1987) (holding that statute governing corporations allowed "alternative equitable remedies not specifically stated in the statute"); *Baker v. Commercial Body Builders, Inc.*, 264 Or. 614, 507 P.2d 387, 395 (1973) ("[C]ourts are not limited to the remedy of dissolution, but may, as an alternative, consider other appropriate equitable relief.").

¶ 25 Analyzing breach of fiduciary claims in this light, courts have narrowed the potentially broad duty espoused by *Donahue* to a more investment-based analysis. *Brodie*, 857 N.E.2d at 1079 (Mass.2006) ("A number of other jurisdictions ... also look to shareholders' 'reasonable expectations' in determining whether to grant relief to an aggrieved minority shareholder in a close corporation."). For example, beginning again with Massachusetts, in *Wilkes v. Springside Nursing Home, Inc.*, the Massachusetts Supreme Court described the termination of an officer from the close corporation as a squeezeout that "effectively frustrate[d] the minority stockholder's purpose in entering on the corporate venture and also den[ied] him an equal return on his investment." 370 Mass. 842, 353 N.E.2d 657, 663 (1976). The *Wilkes* court then explained the importance of balancing a shareholder's expectations with the reasonable and legitimate business interests of the other shareholders. *Id.* "Therefore, when minority stockholders in a close corporation bring suit ... alleging a breach of the strict good faith duty," courts "must carefully analyze the action taken by the controlling stockholders in the individual case" and ask "whether the controlling group can demonstrate a legitimate business purpose for its action." *Id.*

¶ 26 Under this standard for fiduciary duty protection, the termination of an employee is not always a breach of fiduciary duty. *See Merola v. Exergen Corp.*, 423 Mass. 461, 668 N.E.2d 351, 354–55 (1996). In *Merola* the court found the plaintiff's termination was not a breach of fiduciary duty because the plaintiff's investment in the corporation was not tied to employment in any formal way. *Id.* Comparing the facts in *Merola* to the facts in *Wilkes*, the court noted that in *Wilkes* the policy and practice of the corporation was to divide the profits of the corporation equally by way of salaries to the shareholders who participated in the operation of the corporation. This distribution of the company's resources was based on the fact that under the corporation's long-standing policy, employment with the corporation went "hand in hand with stock ownership." *Id.* at 354. The corporation in *Merola*, on the other hand, had no such policy. And,

while the plaintiff may have expected continued employment, the value of his shares were independent of his employment status. *Id.* This was evidenced by the fact of the increase in the value of his stock and a lack of indication that he was required to purchase stock to keep his job. *Id.* The court also noted the plaintiff was not a founding member of the corporation, a fact considered by other courts as well. *Id.*

¶ 27 "Not every discharge of an at-will employee of a close corporation who happens to own stock in the corporation gives rise to a successful breach of fiduciary duty claim." *Id.* at 355. Instead, the court must consider the formal policies and practices of the close corporation, and how these policies and practices are interpreted by and impact all shareholders to determine whether or not a shareholder's reasonable expectations were thwarted. As the North Dakota Supreme Court has explained, when considering an allegation of oppressive conduct, a court should review

> what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression.

*Balvik v. Sylvester*, 411 N.W.2d 383, 387 (N.D.1987) (quoting *Matter of Kemp & Beatley, Inc.*, 64 N.Y.2d 63, 484 N.Y.S.2d 799, 473 N.E.2d 1173, 1179 (1984)); *see also Fox v. 7L Bar Ranch Co.*, 198 Mont. 201, 645 P.2d 929, 933 (1982). This close consideration of shareholders' expectations is necessary to ensure that corporations are not crippled and kept from efficiently operating their business; it is well accepted that corporate officers "must have a large measure of discretion ... in declaring or withholding dividends, deciding whether to merge or consolidate, establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees." *Wilkes*, 353 N.E.2d at 663.

¶ 28 Applying the foregoing principles to this case, we conclude that Cookietree did not thwart McLaughlin's investment expectation. McLaughlin was not a founding member who created the company with the expectation of employment. Instead, after the corporation was well established, McLaughlin was recruited for his specialized experience in similar industries. His primary reason for joining Cookietree was employment. This employment allowed him to purchase stock in Cookietree, but he was not required to do so. And, while it is likely that his initial stock purchase allowance and the later stock purchase agreement were offered as an incentive or reward for McLaughlin's work performance, the purchase allowances were not inextricably tied to his employment; they were a separate investment in the company. In addition to his stock purchases, and unlike the plaintiff in *Wilkes*, McLaughlin was paid a competitive salary for his contributions to the company. His investment in the company was separately rewarded through the payment of dividends, which he continued to receive after his termination. Therefore, in terminating McLaughlin, Schenck[5] did not thwart McLaughlin's investment expectations in the company and therefore did not violate any duty owed to McLaughlin.

¶ 29 McLaughlin also argues that Rosemann and Schenck breached the fiduciary duty they owed to McLaughlin by transferring and later ratifying the stock transaction between Anna Schenck and Greg Schenck. This allegation is dependent, however, on McLaughlin's claim that the transfer was unlawful; all stock transactions promote the parties' interests, and therefore only breach a duty when they are accomplished in an unfair or unlawful manner. Therefore, we next consider whether the stock transaction violated Cookietree's corporate charter or the Corporation Act.

## II. THE SCHENCK TRANSACTION DID NOT VIOLATE THE CORPORATE CHARTER OR THE CORPORATION ACT, BUT THE WAIVERS WERE TAINTED BY A CONFLICT OF INTEREST

¶ 30 The 1991 and 1999 shareholder agreements limit the transfer of shares by imposing first rights of refusal on any share transfer. If a shareholder wishes to sell or otherwise transfer his shares, the shareholder must first offer Cookietree the opportunity to purchase the shares. If Cookietree declines to purchase the stock, then the corporation's shareholders have a right to purchase a portion of the offered shares equal to the percentage of the company's shares they already own. Under the agreements, "[a]ny sale or transfer ... shall be null and void unless the terms, conditions, and provisions of this Agreement are strictly observed and followed." The limitation on share transfers may be waived by a "duly authorized action of [Cookietree's] Board of Directors, or by the Shareholders, upon the express written consent of the owners of at least two-thirds of the Shares ... (excluding those Shares owned by the selling shareholder)."

¶ 31 The transfer of shares from Anna Schenck to Greg Schenck did not conform to the first right of refusal provision; therefore it was void unless the waivers by the Board and three of Cookietree's shareholders were valid. McLaughlin argues that the ratification of the Schenck transaction was invalid because the waivers were based on an expired Shareholder Agreement, were untimely, violated Cookietree's bylaws, and, in the case of the Board waiver, was a conflicting interest transaction under the Corporation

---

5. The district court found that Cookietree, not Schenck, terminated McLaughlin's employment, and therefore, Schenck was not liable for any damages caused by terminating McLaughlin. This was incorrect. Schenck terminated McLaughlin as the president of Cookietree and is liable if in doing so he breached a fiduciary duty, including his duty to discharge both his "management and stockholder responsibilities in conformity with this strict good faith standard." *Wilkes*, 370 Mass. 842, 353 N.E.2d 657, 662

(1976) (quoting *Donahue*, 328 N.E.2d at 515); *see also Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 19, 70 P.3d 35 ("[A]n officer or director of a corporation is not personally liable for torts of the corporation or of its other officers and agents merely by virtue of holding corporate office, but can only incur personal liability by participating in the wrongful activity.") (quoting 3A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 1137, at 209 (rev. ed. 2002)).

Act. We disagree that the waivers were enacted without authority, were untimely, or were in violation of Coookietree's bylaws or of statutory conflict of interest provisions. However, we acknowledge the waivers were tainted by a conflict of interest and thereby remand for a determination of whether they were fair.

¶ 32 First, the stock transaction between Anna and Greg Schenck is subject to the 1991 Shareholder Agreement. McLaughlin argues that the waivers were invalid because the initial transaction occurred when the 1991 Shareholder Agreement was in effect but the waiver occurred after the Agreement was superseded by the 1999 Agreement. Where there was no lapse between the two agreements, there was no such contractual no-mans land. The share transfer and waiver were part of the same transaction and are governed by either the 1991 Agreement or the 1999 Agreement, both of which provide for a waiver of the agreement's limitations on share transfers. In this case, the transaction occurred in August 1999 and the 1999 Shareholder Agreement became effective in November 1999. Therefore, the 1991 Agreement is the controlling document. Whether the waiver was invalid because it was acquired so long after the share transfer is an issue of timeliness, not authority.

¶ 33 Pursuant to the Corporation Act, the waiver was timely. McLaughlin argues the waivers, obtained over six years after the stock transfer, could not have been timely as a matter of law, and therefore the issue should have been submitted to a jury. McLaughlin is correct that whether or not ratification actually occurred is a question of fact. However, he fails to cite any disputed issues of fact that would have prevented the district court from determining the question as a matter of law on summary judgment. There is no dispute that the waivers were obtained, nor is there a challenge to the date of the waivers or the involved parties. Under the Corporation Act, the waivers are effective as of the date indicated by the board of directors in the waiver and consent. Utah Code Ann. § 16–10a–821(2); *see also* 2A William Meade Fletcher, *Cyclopedia of*

*the Law of Private Corporations* § 782 (rev. ed 2009). McLaughlin relies on agency law to argue that the Board should not be allowed to execute the waiver and consent after so much time had elapsed because it would be unfair and disadvantageous to him. To persuade this court to adopt such an equitable principle, McLaughlin must present a developed common law principle or a strong policy reason to support its adoption. He has not argued either. Therefore, we rely on the plain language of the Corporation Act, which allows the board to act retroactively by assigning ex post-facto effective dates to their actions. As presented to the district court, McLaughlin did not present any disputed fact that would foreclose the district court from determining as a matter of law that the waivers were timely.

¶ 34 Additionally, the waivers did not violate Cookietree's bylaws. McLaughlin argues the shareholder waiver violated Cookietree's bylaws because the shareholders signed the waivers without a noticed shareholder meeting, and that an action taken without a meeting must be signed by all the shareholders entitled to vote, whereas he and his wife were not asked to sign. The shareholder waiver, however, is governed by the 1991 Shareholder Agreement, which does not require the votes of all shareholders entitled to vote, but instead only two-thirds of the shareholders. While this may conflict with the bylaws, the Corporation Act allows a corporation to enter a separate shareholder agreement that governs the management and affairs of the corporation and the relationships among the shareholders despite a conflict with the bylaws so long as it does not violate public policy. Utah Code Ann. § 16–10a–732. Therefore, because the shareholder agreement allowed two-thirds of Cookietree's shareholders to waive provisions of the shareholder agreement without a shareholder meeting, the waivers did not violate Cookietree's bylaws.

¶ 35 Turning to the Corporation Act, we hold the waivers were not statutory conflict of interest transactions within its terms. McLaughlin argues the waivers were conflict of interest transactions because each

of the board members that signed the waiver had a conflict of interest. We agree with Greg Schenck's argument that the statute does not apply. Under the Corporation Act, a person is considered to have a conflict of interest if he has an interest in "a *transaction* effected or proposed to be effected by the corporation or by any entity in which the corporation has a controlling interest." *Id.* § 16–10a–850(1) (emphasis added). In this case, the statute does not apply to the waiver because it was not itself a transaction. As explained by the comments to the Model Business Corporation Act, which the Utah Revised Business Corporation Act adopted, a transaction is a two-sided deal, not a unilateral action by the corporation. Model Bus. Corp. Act Ann. ch. 8–F, introductory cmt. (2009). The waiver, as enacted by the board of directors, was a unilateral action by Cookietree, not a "deal"; therefore, it is not subject to the conflict of interest statute. *Id.*

¶ 36 This conclusion, however, does not end our analysis. "Many situations arise in which a director's [or shareholder's] personal economic interest is or may be adverse to the economic interest of the corporation, but which do not entail a 'transaction' by or with the corporation." *Id.* These situations are no less concerning because on the surface they appear to suffer from the same lack of probity and fair dealing as statutory conflict of interest transactions. The law does not ignore such troubling circumstances, but instead leaves the treatment of such situations "for development under the common law." *Id.* The Model Act suggests the procedures designed to deal with statutory conflicts of interest provide a useful strategy for dealing with such situations as a matter of common law. *Id.* We agree.[6]

¶ 37 The procedures provided in the conflict of interest statute most appropriately address nontransaction-related conflict situations because they do not automatically invalidate conflict of interest transactions but instead require the party with a conflict to show the transaction was fair, or require the

vote of disinterested board members or disinterested shareholders to ratify the transaction. Utah Code Ann. § 16–10a–851 (2005). In adopting these procedures for nontransaction-related conflicts, we recognize that many aspects of corporate governance are unfair. However, as close corporation case law repeatedly notes, close corporations are ripe for abuse and oppression of minority shareholders, especially when majority shareholders are commonly both directors and board members. The conflict of interest statute protects against such abuse, but still preserves the ability of close corporations to operate by not invalidating every transaction with a conflict of interest.

¶ 38 Applying this standard, we conclude the waivers ratifying the 1999 share transfer were tainted by a conflict of interest because they were both executed by Greg Schenck, who clearly had an economic interest in waiving the share transfer restrictions of the shareholder agreement that were ignored when he received the shares by which he gained majority control of Cookietree. By waiving the restrictions on the share transfers, Schenck and the other board members and voting shareholders deprived the company and the nonvoting shareholders of the economic opportunity to increase their investment in the corporation. Corporate law is wary of such self-dealing. Cookietree's shareholder agreement also was wary of such activities and excluded sellers from voting on waiving the restrictions on share transfers. The agreement failed, however, to foresee the possible conflicts presented when a buyer is already a corporate shareholder and votes to waive the restrictions on share transfers. We therefore remand for a determination of whether the waivers were fair within the meaning of Utah Code section 16–10a–851, which is a fact-intensive inquiry focusing on whether the waivers were beneficial to the corporation and the shareholders and whether they satisfied the standard of fair dealing. *See* Model Bus. Corp. Act Ann. ch. 8–F, § 8.60.

6. The statutory conflict of interest provisions address the same concerns presented by nontransaction conflicts of interest. Nontransaction conflicts of interest, however, are much less common in publicly held corporations and therefore because the Corporation Act was drafted in the context of such corporations, *see supra* ¶ 20, it fails to address such situations.

## III. A TRIAL COURT MAY DENY A MOTION FOR LEAVE TO AMEND WHEN THE AMENDMENT WAS FUTILE

¶ 39 In its Ruling and Order, the district court did not dismiss McLaughlin's fiduciary duty claim but rejected the grounds on which he pled the claim, leaving open the opportunity to amend the complaint so long as he met the burden of alleging new facts and evidence that would support a claim of breach of fiduciary duty that had not already been addressed by the court. When McLaughlin submitted an amended complaint that added two additional parties but relied on largely the same facts, the district court denied this motion.

¶ 40 When considering a motion to amend, the district court should primarily consider whether the motion would cause unavoidable prejudice to the opposing party. *Aurora Credit Servs., Inc. v. Liberty W. Dev., Inc.*, 970 P.2d 1273, 1282 (Utah 1998). In addition, the district court may also consider "delay, bad faith, or futility of the amendment." *Id.* In this case, the district court correctly held that McLaughlin's proposed amended complaint would have been futile as the court already determined that interparty contracts barred the existence of any duty owed to McLaughlin in relation to the complained of acts. A party cannot obtain a different outcome by adding to the parties or rephrasing claims.

¶ 41 McLaughlin argues the district court had only ruled on fiduciary duties arising out of existing contracts and that his amended complaint raised tort-based theories of fiduciary duties. This is an inaccurate characterization of the district court's determination and, moreover, a distinction without a difference. Regardless of how McLaughlin phrases his claims, they are the same theory: Cookietree shareholders breached their fiduciary duty to McLaughlin by waiving the right of refusal for the 1999 stock transaction and by terminating his employment. Whether this theory is characterized as arising out of contract or tort, it is the same theory—a tort for breach of duty. Thus, we hold the district court did not abuse its discretion because McLaughlin's amendment failed to state new facts or a new theory that had not already been addressed by the court; an amendment would have been futile.

## CONCLUSION

¶ 42 We agree with McLaughlin that shareholders in close corporations stand in fiduciary positions to one another and are required to act with the utmost good faith. However, we also note this duty is not unlimited but instead must be balanced with the legitimate business interest of the corporation and the reasonable expectations of individual shareholders. In this case, however, we hold that McLaughlin's reasonable expectations were not thwarted when he was terminated from Cookietree, and therefore, the defendants did not breach any fiduciary duties owed him. The district court's decision on this issue is affirmed. Additionally, we affirm the district court's decision to deny McLaughlin's attempt to amend his complaint to add additional parties as futile because he could not prove his legal theory by adding individuals to the litigation. Finally, we conclude that the waivers ratifying the 1999 share transfer were contaminated by a conflict of interest and remand for a determination of whether the waivers were fair.

¶ 43 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and District Judge HADFIELD concur in Chief Justice DURHAM'S opinion.

¶ 44 Having disqualified himself, Justice NEHRING does not participate herein; District Judge BEN H. HADFIELD sat.