2006 UT 23

**J. Rodney DANSIE, Almon P. Butterfield, Robert Ernest, James E. Miller, Loriann Warner, Diane Harward, Cloyd James ("C.J.") Butterfield, Shane T. Butterfield, Herbert T. Butterfield, Everett T. Parry, Michael Sweat, Sherwood Butter-**

---

**33.** 958 P.2d 911 (Utah 1998).

**34.** *Adams v. State,* 2005 UT 62, ¶¶ 16–17, 123 P.3d 400.

field, Donna A. Eastman, Herriman Pipeline Development Company, Clyde W. Butterfield, David S. Bastian, Clinton S. Butterfield, Lorraine Alires, and Mary E. Cordova, Plaintiffs and Appellants,

v.

CITY OF HERRIMAN, Lynn Egbert, Eric May, James Newman, Lynn Carne, John Doe individuals 1–100, Doe corporations 1–100, Doe governmental entities 1–100, Defendants and Appellees.

No. 20050024.

Supreme Court of Utah.

April 18, 2006.

Michael M. Later, Las Vegas, Nevada, for appellants John N. Brems, R. Willis Orton, Christopher S. Hill, Salt Lake City, for appellee City of Herriman.

Peter Stirba, Gary R. Guelker, Salt Lake City, for appellees Egbert, May, Newman, and Carne.

NEHRING, Justice:

## INTRODUCTION

¶ 1 The City of Herriman was added to the roster of Utah cities in 1999. Soon thereafter, Herriman decided that it would provide water to its residents through a municipal water system. At the time, Herriman owned no water, no wells, nor any delivery infrastructure, but the Herriman Pipeline and Development Co. ("Company") did. The City set about to acquire the Company's assets. It succeeded, much to the distress of a number of the Company's shareholders, who sued the City and certain directors of the Company. Defendants filed a succession of summary judgment motions that resulted in the dismissal of Plaintiffs' claims. This appeal followed.

¶ 2 We affirm the district court on each of the four issues before us for review. First, we conclude that the district court correctly ruled that Plaintiffs' ownership of shares in the Company entitled them to use Company water but gave them no ownership interest in Company assets. Next, we affirm the district court's dismissal of several of Plaintiffs' individual claims because they were derivative claims that must be properly advanced in the name of the Company. Third, we sustain the district court's dismissal of the derivative claims that Plaintiffs did assert on behalf of the Company because Plaintiffs failed to make the requisite demand on the Company to remedy the alleged objectionable conduct. Finally, we turn back Plaintiffs' claim for relief under the Utah Control Shares Acquisition Act, Utah Code Ann. §§ 61–6–1 to –12 (2000), because such a claim was not preserved below. We now explain how we reached these conclusions.

## ANALYSIS

### I. PLAINTIFFS HAVE NO VESTED PROPERTY RIGHTS IN COMPANY ASSETS

██ ¶ 3 Plaintiffs maintain that under the terms of the Company's articles of incorporation, shareholders, like themselves, own an interest in Company assets. If they are right, they likely suffered injury when Company assets were transferred to the City. The district court ruled that Plaintiffs did not own Company assets. We conclude that the district court was correct. Our reasoning centers on interpretations of relevant statutes and the Company's articles of incorporation.

¶ 4 Under the Utah Revised Nonprofit Corporation Act, effective as of 2001, "[a] member does not have a vested property right resulting from any provision in the articles of incorporation or the bylaws." Utah Code Ann. § 16–6a–611 (2001). The Company is a nonprofit corporation. Were this statutory provision to apply to the Company, our analytical task would be at an end; however, it does not apply. The most recent iteration of the Company's articles of incorporation was put into place in 1986. This matters because the 2001 Act includes an expansive savings clause. It states that "the repeal of any statute by this act does not affect ... any ratification, right, remedy, privilege, obligation, or liability acquired, accrued, or incurred under the [prior nonprofit corporation] statute before its repeal." *Id.* § 16–6a–1704(1)(a)(ii). The statute that the 2001 Act repealed permitted a corporation's

stock to "evidenc[e] ... interests in water or other property rights." *Id.* § 16–6–42 (1999) (repealed 2001). Thus, the savings clause in the 2001 Act would recognize and preserve property rights that shareholders of the Company may have acquired under provisions of its articles of incorporation.

¶ 5 Plaintiffs claim that Article 5 of the Company's articles of incorporation conferred upon them ownership rights to Company assets. The relevant text states that the Company's stock "shall evidence the interests of the stockholders in corporate assets, including water rights, pipelines, water control facilities, and other property. The owner of each share of stock shall be entitled to participate on an equal basis in the use of water, pipelines, and other corporate assets."

¶ 6 We assay this language for meaning using the same approach that we apply to the interpretation of contracts generally. We conclude that the unambiguous meaning of Article 5 may be extracted from the plain language of its text. That meaning does not conform to Plaintiffs' preferred interpretation. The meaning of the word "interests" is key to our interpretive effort. To confer the rights claimed by Plaintiffs, the word "interests" must be read to grant shareholders something akin to fee simple ownership. This is certainly not the sole, inevitable connotation of the word. Indeed, as used in Article 5, "interests" tells us little more than that whatever a shareholder's "interests" might be, the stock certificate is proof that he has them. If the articles of incorporation said nothing more about the relationship between Company shareholders and Company assets, there could be little question that Article 5's use of "interests" would be ambiguous. The obvious question, "just what 'interests' are evidenced by shares of Company stock?" would remain unanswered.

¶ 7 *Black's Law Dictionary* has defined "interest" as "[t]he most general term that can be employed to denote a right, claim, title, or legal share in something." *Black's Law Dictionary* 812 (6th ed.1990). As the "most general" term in the property lexicon, "interest," standing alone, means both everything and nothing. It is a word that leans heavily on other words for support.

¶ 8 That support appears in the second sentence of Article 5. Its text provides that the interest possessed by the members is the right "to participate on an equal basis in the use of water, pipelines, and other corporate assets." Shareholders are promised equal participation, not in the ownership, but rather in the *use* of Company assets. This is *the* interest that stock ownership evidences. It is not the interest that Plaintiffs insist that their shares guaranteed, but it is an interest that survived intact the transfer of Company assets to the City. Thus, the plain language of the Articles defeats Plaintiffs' claim to asset ownership.

## II. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' CLAIMS BECAUSE THE CLAIMS WERE DERIVATIVE AND NOT INDIVIDUAL

¶ 9 A shareholder must bring an action to enforce a right of the corporation as a derivative action. Utah R. Civ. P. 23.1. The district court dismissed eight of Plaintiffs' claims because it found them to be corporate and not individual claims. These included claims for the following: (1) breach of fiduciary duty by the directors for selling Company assets, (2) breach of fiduciary duty by certain directors for providing insufficient notice of a meeting, (3) breach of fiduciary duty by the directors for allowing the purchase of stock in violation of Company bylaws, (4) self-dealing by certain directors, (5) tortious interference with economic relations, (6) declaratory relief, (7) unjust enrichment, and (8) injunctive relief to bar the transfer agreement and the City's stock purchases. Plaintiffs challenge these rulings.

¶ 10 Not every grievance held by a shareholder arising from actions by a corporation, its officers, or its directors must be brought through a derivative action. A shareholder may sue in his individual capacity in a direct action when he can "show that he ... was injured in a manner distinct from the corporation." *Warner v. DMG Color, Inc.*, 2000 UT 102, ¶ 13, 20 P.3d 868. Plaintiffs insist that their claims arise from individual and not corporate injuries and that

they need not assert them in the name of the Company. We think otherwise.

¶ 11 Plaintiffs' core complaint is that the City used its voting control of the Company to approve an agreement that transferred Company assets to itself. According to Plaintiffs, this act of self-dealing enriched one class of shareholders, the City, at the expense of another class, the Plaintiffs. Because this case comes to us after a grant of summary judgment, we indulge Plaintiffs, as the nonmoving party, all reasonable inferences that may be derived from the factual record. *Hermansen v. Tasulis,* 2002 UT 52, ¶ 10, 48 P.3d 235.

¶ 12 We are unable to uncover any behavior by Defendants that was animated by a desire to injure Plaintiffs in their individual capacities. To the contrary, the City acquired and voted Company shares for the sole purpose of acquiring a "turnkey" water system for Herriman. Indeed, Herriman appears to be wholly unapologetic about its intentions. However sinister one may view Herriman's designs, the transfer of Company assets to a majority shareholder does not of itself endow dissenting shareholders with individual claims.

¶ 13 To think otherwise is to misunderstand the distinction between individual and corporate injury. A shareholder does not sustain an individual injury because a corporate act results in disparate treatment among shareholders. Rather, the shareholder must examine his injury in relation to the corporation and demonstrate that the injury was visited upon him and not the corporation. *Arndt v. First Interstate Bank of Utah, N.A.,* 1999 UT 91, ¶¶ 21–22, 991 P.2d 584. Here, Plaintiffs' claims are classically derivative: the value of the Company, and by extension Plaintiffs' shares in it, was diminished by the transfer of the Company's assets to the City. Plaintiffs were injured because the Company was injured.

¶ 14 Viewing the asset transfer from a second perspective, that of Herriman as a shareholder, reinforces the correctness of the district court's ruling that Plaintiffs' claims were derivative. While it is clear that Herriman's interests in creating a municipal water system were advanced by its acquisition of Company assets, the effect of the transfer on the City's shares in the Company was the same as the consequences, whatever they may have been, that befell Plaintiff shareholders as a result of the asset transfer. We therefore affirm the district court's dismissal of claims that should have been brought derivatively.

## III. PLAINTIFFS' CLAIMS ARE NOT ELIGIBLE FOR APPLICATION OF EXCEPTIONS TO THE DERIVATIVE ACTION REQUIREMENTS

¶ 15 We have acknowledged that circumstances may exist under which a shareholder may prosecute a claim that would normally belong to a corporation. We ratified one such exception to the derivative action rule in *Aurora Credit Services, Inc. v. Liberty West Development, Inc.,* 970 P.2d 1273, 1280 (Utah 1998). There, we permitted a shareholder that had acquired its shares by foreclosing its security interest in them to bring a direct action against a closely held corporation with a limited number of principals, four original shareholders, and a CEO. The plaintiff shareholder claimed that the corporation and CEO had unlawfully transferred an office building, the sole asset of the corporation, to a partnership in which the CEO had an interest. We recognized in *Aurora* that

> the rationale for requiring an action to proceed derivatively is often absent in a closely held corporation, where it is unlikely that there is a disinterested board because the majority shareholders are often the corporation's managers. As well, the concept of a corporate injury that is distinct from any injury to the shareholders approaches the fictional in the case of a firm with only a handful of shareholders.

*Id.* at 1280–81 (citations omitted).

¶ 16 We justified our holding in part by aligning it with "a growing trend to allow minority shareholders of a closely held corporation to proceed directly against majority shareholders." *Id.* at 1280. Spotting trends in the law is an inexact science. A phenomenon that has the hallmarks of a trend may prove to be nothing more than an aggrega-

tion of ad hoc events. Nor is it unusual for the momentum of a proven trend to over-stretch its logical and conceptual capabilities, stopping the trend in its tracks or causing it to retreat. From our vantage point eight years after *Aurora,* we can see that our proclamation of a "growing trend" in recognizing an exception to the derivative action rule for closely held corporations may have overstated matters. Some jurisdictions have rejected the closely held corporation exception or severely limited it. Peter H. Donaldson, *Breathing Life Into Aurora Credit Services, Inc. v. Liberty West Development, Inc.,* 2002 Utah L.Rev. 519, 532–33. Since *Aurora,* we have not had the opportunity to fully delineate the bounds of the exception in Utah. However, such a task must wait for another day because the Company in this case is not a closely held corporation, nor is its cast of shareholders and principals as small as that present in *Aurora.*

¶ 17 Although various statutes and courts have defined closely held corporations differently, Carol A. Jones & Britta M. Larsen, *Fletcher Cyclopedia of Private Corporations* § 70.10 (perm. ed.2002), "[c]ourts generally identify common law close corporations by three characteristics: (1) a small number of shareholders; (2) no ready market for corporate stock; and (3) active shareholder participation in the business." *Id.* Today, we need only examine the first characteristic, the number of shareholders. According to its records, the Company had over 120 shareholders. This substantially exceeds the number of shareholders other jurisdictions permit in close corporations. *Id.* The number of shareholders is essential to evaluating the merits of the close corporation exception to the derivative action rule because of the risk that direct suits can work an injustice on other shareholders. Damages recovered by an individual shareholder from a corporation or in its stead leave uncompensated all other similarly injured shareholders and the value of the corporation potentially diluted. As we noted in *Aurora,* direct actions should not be allowed if doing so would "expose the corporation ... to a multiplicity of actions." 970 P.2d at 1280. While outlined in *Aurora* as a limitation to the availability of direct actions for closely held corporations, it also explains

a primary reason why corporations with more than a handful of shareholders are disqualified as closely held corporations in the first place. While we decline to set an arbitrary ceiling on the number of shareholders that a corporation may have before it becomes ineligible for treatment as a closely held corporation, we hold that the Company's complement of shareholders well exceeded it.

## IV. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFFS' DERIVATIVE CLAIMS BECAUSE DEMAND ON THE COMPANY WAS REQUIRED

¶ 18 Although the trial court dismissed their individual claims, Plaintiffs were granted leave to refile them as derivative claims on behalf of the Company. However, the district court turned back the refiled derivative claims because Plaintiffs failed to make proper demand on the Company to correct their alleged misdeeds before filing suit, a condition precedent to bringing a derivative claim.

¶ 19 Both the Utah Rules of Civil Procedure and the Revised Nonprofit Corporation Act require that a derivative action must "allege with particularity" that demand was made on the directors and why the directors failed to act or why demand was not made. Utah Code Ann. § 16–6a–612(3) (2001); Utah R. Civ. P. 23.1. We note that a literal reading of the text of these provisions imposes a heightened degree of attention to detail in the pleading of demands upon a corporation. The language implies that to satisfy the statute, a demand must be sufficiently comprehensive in articulating the shareholder grievance and pointed in its expectation for corrective corporate action to be capable of being "particularized." Both the rule and the statute include, albeit by implication, substantive requirements for shareholder demands. The district court found that Plaintiffs' demands did not meet these requirements, and we agree.

¶ 20 The second amended complaint, where Plaintiffs first brought their derivative claims, does not allege that any demand was made or that the demand requirement was

waived. In their briefs to this court, Plaintiffs now claim that, notwithstanding the deficiencies in their pleadings, they in fact made adequate demand or, in the alternative, demand was not required. We disagree.

### A. Demand Was Not Made

■ ¶ 21 This court has articulated the requirement that a party make a demand on the corporation. "The stockholder must show ... that a demand upon the board of directors or other managing body, to have an action brought and prosecuted in the name of the corporation to redress the grievances complained of, has been made and refused." *Tripp v. Dist. Ct.*, 89 Utah 8, 56 P.2d 1355, 1359 (1936). Plaintiffs list several interactions between themselves and the Company which they claim satisfy this requirement. The questions before us are, then, what are the essential characteristics of a demand and are they present in Plaintiffs' communications with the Company?

■ ¶ 22 Plaintiffs claim that our case law offers ambiguous direction concerning the necessary features of a demand. We disagree. To the contrary, *Tripp* is quite explicit on this point. As noted, the demand must be "to have an action brought and prosecuted in the name of the corporation to redress the grievances complained of." *Id.* Therefore, the demand must not merely remonstrate against a certain corporate policy. Rather, the communication must articulate legal claims that the corporation holds and insist that the corporation pursue them.

¶ 23 None of the communications from Plaintiffs to the Company meet these standards. Several of them voice opposition to the proposed asset transfer, communicated both orally at Company meetings and in letters demanding certain analyses of corporate assets be undertaken prior to the transfer. Such expressions of disagreement fall short of the demand requirement because none of them insist that the corporation seek legal remedies. The interaction that comes closest to meeting the requirement occurred prior to the transfer of assets at a meeting of the board of directors at which Plaintiffs informed Company directors that they would pursue legal action if the corporation followed through with the asset transfer. However, this communication was inadequate for two reasons. First, it did not demand that the corporation pursue legal action. Second, it failed to outline the specific legal claims that Plaintiffs wanted rectified.

### B. The Demand Requirement Was Not Waived by the Futility Exception

■ ¶ 24 Both the Revised Nonprofit Corporation Act and the Utah Rules of Civil Procedure allow the demand requirement to be waived if a plaintiff alleges with particularity why demand was not made. Utah Code Ann. § 16–6a–612(3)(a)(ii) (2001); Utah R. Civ. P. 23.1. This court has held that for that exception to be satisfied, "the circumstances [must be] such that such a demand would be futile and unavailing." *Tripp*, 56 P.2d at 1359. Therefore, we must examine first whether Plaintiffs did allege with particularity why demand would be futile and whether that allegation establishes that demand would have been futile and unavailing.

■ ¶ 25 Before us, Plaintiffs allege that the continued antagonistic relationship between Plaintiffs and Herriman, as evidenced by this litigation, demonstrates that a perfectly crafted demand would have been futile. However, this is the first instance where they present such a claim. The second amended complaint, in which Plaintiffs brought their derivative claims, makes no mention of the futility exception and fails to address why demand would have been futile. This fact alone would be a sufficient basis for turning away Plaintiffs' futility claims; however, even had Plaintiffs properly preserved their futility claims, a close analysis shows that they are insufficient to satisfy the exception and waive the demand requirement.

■ ¶ 26 It is axiomatic that the right to seek the redress of corporate grievances belongs to the corporation to be exercised by corporate management. *See, e.g., In re Kauffman Mut. Fund Actions*, 479 F.2d 257 (1st Cir.1973). Utah Rule of Civil Procedure 23.1 provides an exception to this general rule by allowing members or shareholders to bring derivative actions, but this exception must be carefully applied in order to protect

the right of corporations to govern their own affairs. *In re Kauffman,* 479 F.2d at 263–64. Therefore, we must exercise considerable caution before using futility to relieve a shareholder of his obligation to make the statutorily-required demand.

¶ 27 This presumption is further strengthened by the relative ease with which demand can be made. A potential litigant would, of necessity, have prepared and outlined the legal claims upon which his lawsuit will be based. The marginal cost for presenting these claims to corporate management and demanding that they take them up is so insignificant that to strip the corporation of its rights based solely on conjecture or a post hoc judicial determination would be unreasonable in most instances. Courts must not leave such determinations of futility to the subjective determination of the party upon which the law requires action; to do so unnecessarily risks stripping the corporation of its rights. In fact, it will generally require less effort for the plaintiff to make a demand on the corporation than to satisfy rule 23.1's stringent pleading requirements. For this reason, application of rule 23.1's futility exception requires close scrutiny.

¶ 28 We can conceive of two instances in which the futility exception would be met. For the first, we borrow logic from *Jenkins v. Equipment Center, Inc.,* 869 P.2d 1000 (Utah Ct.App.1994), a case dealing with a futility exception to the requirement that an obligor tender payment as a condition to being excused from performance. In *Jenkins,* we stated that tender is "excused where the lienor states that he or she does not intend to accept payment." *Id.* at 1003. Likewise, in the corporate setting, demand would be futile if the corporation had specifically and explicitly stated that it would not pursue the claims brought in the derivative action. The futility exception could also excuse a shareholder from making a demand when doing so would be substantively detrimental. Such a circumstance could arise if the demand would risk further injury to the corporation by, for example, permitting the alleged perpetrator to cover up his misdeeds or to cause further harm to the corporation

because he had been alerted that his unlawful conduct had been uncovered.

¶ 29 Neither instance is applicable in this case. The Company never explicitly stated that it would not pursue the specific claims raised in this derivative action. Nor would there have been a detriment to Plaintiffs in making a demand. Herriman already knew that it was embroiled in litigation and presumably acted accordingly. Therefore, a demand prior to the filing of Plaintiffs' second amended complaint would not have affected the Company's behavior to Plaintiffs' detriment.

## V. THE UTAH CONTROL SHARES ACQUISITIONS ACT IS INAPPLICABLE BECAUSE IT WAS NOT RAISED AT THE DISTRICT COURT

¶ 30 Plaintiffs failed to raise claims based on the Control Shares Acquisition Act, Utah Code Ann. §§ 61–6–1 to –12 (2000), at any stage of the proceedings prior to their appeal to this court. They claim that they should be permitted to inject claims based on alleged violations of the Act now because they "specifically argued the illegality of [Herriman]'s acquisition and voting of its stock and the improper refusal of the Company and [Herriman] to pay the [Plaintiffs] the fair value of their stock." Plaintiffs appear to rely on the principle of appellate review that "[a] matter is sufficiently raised if it has been submitted to the trial court and the trial court has had the opportunity to make findings of fact or law." *James v. Preston,* 746 P.2d 799, 801 (Utah Ct.App. 1987). To accept Plaintiffs' interpretation of our preservation standard would require us to distort it beyond recognition. Their position—that once a plaintiff brands conduct "illegal," he has preserved for appeal all potential theories—swallows whole the doctrine of preservation. Instead, "[o]rderly procedure ... requires that a party must present his entire case and his theory or theories of recovery to the trial court." *Simpson v. Gen. Motors Corp.,* 24 Utah 2d 301, 470 P.2d 399, 401 (1970). By failing to mention the Control Shares Act, or even so much as the legal theory upon which the Act is based, Plaintiffs have forfeited the opportunity to

seek relief under the Act before this court. This rule makes sense and is necessary; if the trial court was not even made aware of the legal theory underlying the claim, then there is no way it could have ruled on the claim.

## CONCLUSION

¶ 31 We affirm the district court on its conclusions that Plaintiffs had no vested property rights, that Plaintiffs' original claims properly belonged to the corporation, that Plaintiffs failed to make proper demand on the corporation prior to bringing a derivative lawsuit, and that demand was not excused through the futility exception. Furthermore, we need not rule on Plaintiffs' claim based on the Control Shares Act because such a claim was not raised below.

¶ 32 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Judge HADFIELD concur in Justice NEHRING'S opinion.

¶ 33 Having disqualified herself, Chief Justice DURHAM does not participate herein; District Judge BEN H. HADFIELD sat.