*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 72**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JAMES ROBERT RAWCLIFFE,
*Appellant,*

*v.*

ROBERT ANCIAUX, ET AL.,[1]
*Appellees.*

No. 20150852
Filed October 11, 2017

On Direct Appeal

Third District, Salt Lake
The Honorable Heather Brereton
No. 140905252

Attorneys:

Eric L. Zagar, Robin Winchester, Kristen L. Ross, Radnor, PA,
J. Ryan Mitchell, Steven J. Joffee, Salt Lake City,
for appellant

Erik A. Christiansen, Alan S. Mouritsen, Salt Lake City,
Douglas A. Rappaport, Lucy C. Malcolm, James Tysse,
New York, NY, for appellees

JUSTICE DURHAM authored the opinion of the Court in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, and PRESIDING JUDGE ORME joined.

Having recused himself, JUSTICE PEARCE does not participate herein; COURT OF APPEALS PRESIDING JUDGE GREGORY ORME sat.

---

[1] Other appellees are Jerry G. McClain, Ronald S. Poelman, James H. Bramble, Jim Brown, Gilbert Fuller, Kevin G. Guest, Daniel A. Macuga, David A. Wentz, Deborah Woo, and Nominal Defendant USANA Health Sciences, Inc.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1 James Rawcliffe, a shareholder of USANA Health Sciences, Inc., brought this action against USANA's board of directors and several of its officers for authorizing and receiving spring-loaded, stock-settled stock appreciation rights (SSARs). Mr. Rawcliffe concedes that USANA's Compensation Committee strictly complied with the company's compensation plan in authorizing the SSARs. Based on this and the absence of an allegation that the Compensation Committee intended to circumvent the plan, the district court dismissed all of Mr. Rawcliffe's claims under Utah Rule of Civil Procedure 12(b)(6) without prejudice. We affirm.

## BACKGROUND

¶2 In 2006, USANA's board of directors approved, and its shareholders ratified, the USANA Health Sciences, Inc. 2006 Equity Incentive Award Plan (Plan). Pursuant to the Plan, the board of directors established the Compensation Committee, consisting of three members of the board of directors. The Plan gave the Compensation Committee the "exclusive power, authority, and discretion" to award SSARs to directors, officers, and other employees, as an incentive to continue working diligently for the company.

¶3 SSARs, as defined by the Plan, are a specific type of incentive award that differs somewhat from stock options. On the day that the Compensation Committee awards SSARs, called the "grant date," the "exercise price" for the SSARs is set. The exercise price of each SSAR is equal to the average trading price of USANA's stock on the grant date.[2] After the vesting period runs, the awardee can exercise the SSARs and receive stock as compensation. The day on which the awardee exercises the SSARs is called the "exercise date." When the awardee exercises her SSARs, she is given stock in an amount reflecting the difference between the market price of USANA's stock

---

[2] The exercise price must be set by the Compensation Committee at not less than "100% of the Fair Market Value on the date of grant." The Plan defines Fair Market Value as "the mean between the highest and lowest selling price of a share of Common Stock on the principal exchange on which shares of Common Stock are then trading, if any, on such date, or if shares were not traded on such date, then on the closest preceding date on which a trade occurred."

on the exercise date, and the exercise price.[3] The recipient does not need to pay an exercise price.

¶4 The lower the exercise price and the higher the value of the company's stock on the exercise date, the more the SSARs are worth. When the market price is lower on the exercise date than on the grant date, the SSARs are "out of the money" and return no value to the holder; if the SSARs are exercised when the market price is higher than the exercise price, they are "in the money," and the holder then receives the difference in price in the form of USANA stock.

¶5 While the Plan allows SSARs to be granted as incentive awards, it does not explicitly mention spring-loaded SSARs. Spring-loading involves granting equity awards just prior to the release of non-public information reasonably expected to drive up the market price of the company's stock. Spring-loading increases the value of SSARs because the exercise price is set on a day when the good news has not yet been released, making the exercise price lower than if it were to be set after the good news was released. It makes the SSARs more likely to be "in the money" once they vest and also increases

_____

[3] The terminology under the Plan is somewhat confusing. We provide the following information and a hypothetical to explain how this works. In this case, the SSARs were granted, and the exercise price was set, on February 3, 2014, (the grant date) with an exercise price of $57.62 (the market value of USANA's stock on February 3rd). The SSARs each had specific vesting periods, during which they could not be exercised. The earliest any of the SSARs could be exercised was 23 months after the grant date. Thus, as a hypothetical, if a director exercised her SSARs on February 3, 2017, (three years after the grant date) and the fair market value of USANA's stock was $100 per share on the date she exercised them (called the exercise date), the director would be granted $42.38 worth of USANA stock per SSAR that she was granted. This is tied to the following calculation: $100 (the fair market value of USANA stock on the exercise date) – $57.62 (the exercise price) = $42.38. So, if a director were granted 12,000 SSARs in this hypothetical, the director would get $508,560 worth of USANA stock.

If the SSARs were granted on February 5, 2014, the day after the good news was announced, the exercise price would have been $68.46. Under the same hypothetical, each SSAR would be worth only $31.54 on February 3, 2017, for a total value of $378,480.

the difference between the exercise price and the market price on the exercise date.

¶6 The Plan states only that the exercise price must be at least 100 percent of the "Fair Market Value"[4] of the common stock on the date of the grant, with no mention of spring-loading. In this case, the Committee awarded SSARs on February 3, 2014, to four members of the board of directors (including the three directors serving on the Compensation Committee) and several corporate officers. These awards were made just one day before USANA announced its net sales and earnings per share figures from 2013, which greatly exceeded expectations. On February 6, 2014, each of the defendants filed a Form 4 with the Securities and Exchange Commission disclosing the SSARs awards. The SSARs' exercise price the day they were granted was $57.62. On February 5, 2014, after the announcement, the company's stock price rose to $68.46 per share, a gain of $10.84 per share or 18.8 percent in two days. While the value of USANA's stock rose 18.8 percent just two days after the exercise price was set, the SSARs did not vest, and could not be exercised, until 23 to 42 months later. Thus, the directors and officers could not realize that 18.8 percent increase until their SSARs had vested, and only if USANA's stock either maintained its $68.46 value or it increased in value during that vesting period.

¶7 Mr. Rawcliffe acknowledges that the issuance of the spring-loaded SSARs complied with the terms of the Plan. He argues only that it violated the underlying "spirit" of the Plan. Accordingly, he alleges that the Compensation Committee members breached their fiduciary duties and wasted corporate assets. He also alleges that one director, who was not a member of the Compensation Committee, and several officers breached their fiduciary duties and were unjustly enriched by passively receiving the spring-loaded SSARs.

**STANDARD OF REVIEW**

¶8 A motion to dismiss presents a question of law that is reviewed de novo, giving "no deference" to the district court's analysis. *See State v. Ririe*, 2015 UT 37, ¶ 5, 345 P.3d 1261.

---

[4] *See supra* note 2 (giving the Plan's definition of "Fair Market Value").

## ANALYSIS

¶9 We first clarify the fiduciary duties imposed on corporate directors and officers under the Utah Revised Business Corporation Act. Next, we address Mr. Rawcliffe's substantive claims in this case.

## I. DUTIES OWED BY CORPORATE OFFICERS AND DIRECTORS

¶10 The question of whether spring-loading SSARs constitutes a breach of fiduciary duty is an issue of first impression in Utah. Corporate fiduciary duties were originally creatures of common law. Now, Utah corporations are governed by the Utah Revised Business Corporation Act (URBCA). UTAH CODE §§ 16-10a-101 to -1804. Utah Code section 16-10a-840(4)[5] codifies when a corporate director or officer can be held liable and states that:

> (4) A director or officer *is not liable* to the corporation [or] its shareholders . . . for *any* action taken, or *any* failure to take any action, as an officer or director, as the case may be, *unless*:
>
> (a) the director or officer has breached or failed to perform the duties of the office in compliance with this section; and
>
> (b) the breach or failure to perform constitutes gross negligence, willful misconduct, or intentional infliction of harm on the corporation or the shareholders.

(Emphases added).

¶11 As the emphasized portions show, this statute requires that a cause of action brought by a corporation or shareholder[6] against a director or officer, for the official acts of the director or officer, must be for a breach of Utah Code section 16-10-840(4). *See Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (holding that we interpret statutes to determine the intent of the legislature by looking first to

---

[5] This section was amended effective May 9, 2017. *See* H.B. 41, 62nd Legis. § 1 (2017). However, the provisions at issue here remain substantially unchanged. For this reason, we cite the current version of the statute.

[6] The statute also lists "any conservator or receiver, or any assignee or successor-in-interest thereof . . . ." UTAH CODE § 16-10a-840(4).

the plain language); *see also* UTAH CODE § 16-10a-842(1) (providing for director liability if a director "votes for or assents to a distribution" that violates the URBCA "or the articles of incorporation," but only if "the director's duties were not performed in compliance with Section 16-10a-840"). Otherwise, if it is not a breach of subsection (4), the "director or officer *is not liable* to the corporation [or] its shareholders," absent some other statutory authorization. UTAH CODE § 16-10a-840(4) (emphasis added).

¶12 Subsection (4) mandates that a corporation or shareholder prove two things before a director or officer can be held liable: (1) that the director or officer breached a duty enumerated in Utah Code section 16-10a-840(1); and (2) that the director or officer breached the duty with a mental state listed in Utah Code section 16-10a-840(4)(b). According to the plain language in subsection (4), both a breach of a standard of conduct in subsection (1) and a mental state listed in subsection (4)(b) are required to hold a director or officer liable. We will first discuss the standards of conduct that corporate directors and officers owe under the URBCA and then the mental states required to establish liability.

*A. Standards of Conduct Under Utah Code Section 16-10a-840(4)(a)*

¶13 Under Utah Code section 16-10a-840(4)(a), to determine whether a corporate director or officer is liable to the corporation or its shareholders the first step of the analysis is to determine whether the "director or officer has breached or failed to perform the duties of the office in compliance with this section." The only duties identified in section 16-10a-840 are located in subsection (1). Utah Code section 16-10a-840(1) provides that:

> (1) Each director shall discharge the director's duties as a director, including duties as a member of a committee, and each officer with discretionary authority shall discharge the officer's duties under that authority:
>
> (a) in good faith;
>
> (b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
>
> (c) in a manner the director or officer reasonably believes to be in the best interests of the corporation.

¶14 A claim against a corporate officer or director must establish a breach of one of these duties or otherwise establish a breach of this

subsection. *Cf. McLaughlin v. Schenk*, 2009 UT 64, ¶ 16, 220 P.3d 146 ("Under the [URBCA], directors and officers are required to carry out their corporate duties in good faith, with prudent care, and in the best interest of the corporation." (citing UTAH CODE § 16-10a-840 (2005))). Section 16-10a-840(1) codified the common law duties identified in our precedent, but the statute does not provide definitions of the enumerated duties beyond what is written in subsection (1).[7] "When the legislature 'borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (citation omitted). Thus, the common law assists in defining the scope of the duty, as long as the duty itself is identified by the plain language of the statute and our common law does not conflict with any statutory guidance on the scope of that duty.[8]

---

[7] The legislature appears to have codified the common law duties of good faith, care, and loyalty. Subsection (1)(a) corresponds to the common law duty of good faith. Subsection (1)(b) appears to codify the duty of care. *Compare* UTAH CODE § 16-10a-840(1)(b) (Directors must act "with the care an ordinarily prudent person in a like position would exercise under similar circumstances . . . ."), *with Warren v. Robison*, 57 P. 287, 291 (Utah 1899) ("[D]irectors . . . must exercise ordinary care, skill, and diligence. . . . [I]t is necessary for them to give the business under their care such attention as an ordinarily discreet business man would give to his own concerns under similar circumstances . . . ."). Subsection (1)(c) appears to codify the duty of loyalty. *Compare* UTAH CODE § 16-10a-840(1)(c) (Directors have the duty to act "in a manner the director . . . reasonably believes to be in the best interests of the corporation."), *with Nicholson v. Evans*, 642 P.2d 727, 730 (Utah 1982) (the duty of loyalty requires directors "to use their ingenuity, influence, and energy, and to employ all the resources of the corporation, to preserve and enhance the property and earning power of the corporation, even if the interests of the corporation are in conflict with their own personal interests").

[8] The mandatory language of Utah Code section 16-10a-840(4), stating that a director or officer "is not liable" unless she violates subsection (4), is very broad. While this subsection, and its incorporation of subsection (1), appears to codify the common law

(continued . . .)

¶15  Mr. Rawcliffe's arguments only fall under the duty of good faith, identified in subsection (1)(a), and the duty to act in a manner that the director or officer reasonably believes to be in the best interests of the corporation, identified in subsection (1)(c). We now discuss the scope of these two duties, but do not address the scope of the duty identified in subsection (1)(b), because Mr. Rawcliffe does not argue a breach of that duty.

¶16 Mr. Rawcliffe cites *Glen Allen Mining Co. v. Park Galena Mining Co.*, for the scope of the first listed duty—the duty of good faith—arguing that it requires all the acts of the directors and officers to "be for the benefit of the corporation and not for their own benefit. . . . They are not permitted to profit as individuals by virtue of their position." 296 P. 231, 240 (Utah 1931). However, this statement conflicts with other portions of the URBCA leading us to reject it as an accurate statement of "good faith" under Utah Code section 16-10a-840(1)(a). For instance, the URBCA authorizes the board of directors to set their own compensation, UTAH CODE § 16-10a-811, and to "determine the terms upon which" shares, stock options, or other securities "are issued, their form and content, and the consideration for which the shares are to be issued," *id*. § 16-10a-624(1). This leads us to believe that the duty of good faith under the URCBA does not prohibit directors from personally benefitting from their position, subject to some restrictions. *See C & Y Corp. v. Gen. Biometrics, Inc.*, 896 P.2d 47, 54 (Utah Ct. App. 1995) ("[S]o long as corporate officers [or directors] act fairly and in good faith, they are not precluded from dealing or contracting with the corporation merely because they are its officers [or directors]." (second and third alterations in original) (quoting *Runswick v. Floor*, 208 P.2d 948, 951 (Utah 1949))); *Branch v. W. Factors, Inc.*, 502 P.2d 570, 571 (Utah 1972) (stating that directors are not precluded from dealing with the corporation unless "there is an entire absence of . . . good faith" or there is "fraud and collusion" (citation omitted)).

---

(continued . . .)
duties held by corporate officers and directors, such duties are now creatures of statute and may be modified as the legislature sees fit. Thus, the common law of corporate fiduciary duties applies only insofar as it does not conflict with the statute. Whether the common law fiduciary duties exist independent of the statute remains an open question, as the parties concede that the statute applies to Mr. Rawcliffe's fiduciary duty claims in this case.

¶17 To breach the duty of good faith, the director or officer must typically act in bad faith. *See Hansen v. Granite Holding Co.*, 218 P.2d 274, 280 (Utah 1950) (the defendants agreed with the formulation of the good faith standard, arguing only that "no bad faith has been shown"); *Chapman v. Troy Laundry Co.*, 47 P.2d 1054, 1064 (Utah 1935) (stating that when a director breaches the duty of good faith, "they are guilty of bad faith"). Bad faith involves some form of "[d]ishonesty of belief, purpose, or motive."[9] *Bad Faith*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 64–67 (Del. 2006). Thus, this duty is breached when a director or officer intentionally harms the corporation, intentionally benefits herself to the detriment of the corporation, displays an intentional dereliction of duty or a conscious disregard for her responsibilities, or takes some similar action.[10] *See Glen Allen Mining Co.*, 296 P. at 241 (holding that directors act in bad faith when they take any action "looking to the impairment of corporate rights,

---

[9] There may be other ways to violate the duty of good faith that do not necessarily require intentional or willful misconduct. The statutory scheme indicates that gross negligence could also apply to a violation of the duty of good faith as Utah Code section 16-10a-840(4)(b) does not limit the application of "gross negligence" to any one duty under Utah Code section 16-10a-840(1). *See* MODEL BUS. CORP. ACT § 8.31 cmt. at 8-241 (AM. BAR ASS'N 2013 Revision) (stating that "decision-making outside the bounds of reasonable judgment" – that could include such things as "an abuse of discretion," "constructive fraud," or "reckless indifference" – "can give rise to an inference of bad faith"). However, the determination of this question is not necessary to this case. We merely note that intentionally or willfully taking an action that the director knows is not in the best interests of the corporation is evidence of bad faith and is a violation of the duty of good faith. *See Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 638 (Del. Ch. 2013) ("The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated." (citation omitted)).

[10] In *McLaughlin*, this court held that, under the URBCA, directors of closely held corporations owe the heightened fiduciary duty of the utmost good faith. 2009 UT 64, ¶ 42. While this varies somewhat from the traditional duty of good faith, we held that such a heightened duty exists in closely held corporations through our interpretation of the statute itself. *Id.* ¶ 20 (interpreting the statute "in a way that achieves the intent and goal of the Act as a whole").

the sacrifice of corporate interests, the retardation of the objects of the corporation, and more especially the destruction of the corporation itself"); *In re Walt Disney*, 906 A.2d at 67 (Bad faith includes "the intent to violate applicable positive law, or . . . intentionally fail[ing] to act in the face of a known duty to act, demonstrating a conscious disregard for [a director's] duties." (citation omitted)).

¶18 The third duty, codified under subsection (1)(c), requires that a director act in a manner which she "reasonably believes to be in the best interests of the corporation." UTAH CODE § 16-10a-840(1)(c). This duty significantly overlaps with the duty of good faith codified in subsection (1)(a). Some jurisdictions have even classified the duty of good faith as a subset of the duty of loyalty. *See, e.g., Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (stating that, "good faith 'is a subsidiary element[,]' i.e., a condition, 'of the fundamental duty of loyalty.'" (alteration in original) (citation omitted)). However, the statutory scheme compels us to recognize differences between each of the three duties listed in Utah Code section 16-10a-840(1). For instance, the URBCA allows corporations to indemnify their directors for a breach of the statutory duty of care identified in Utah Code section 16-10a-840(1)(b), but does not allow them to indemnify their directors for a breach of the duty of good faith identified in section 16-10a-840(1)(a), or a breach of the duty of loyalty identified in section 16-10a-840(1)(c). *See* UTAH CODE § 16-10a-902(1) ("[A] corporation may indemnify . . . a director[] against liability incurred . . . if: (a) his conduct was in good faith; and (b) he reasonably believed that his conduct was in, or not opposed to, the corporation's best interests . . . .").

¶19 One difference between subsections (1)(a) and (1)(c) is the mental state required under the plain language of the statute. When a director breaches the duty of good faith in (1)(a), she typically does so through intentional or willful misconduct. When a director breaches (1)(c) however, she must be acting on an unreasonable belief that her actions would be in the best interest of the company.[11]

---

[11] The Delaware Supreme Court made it clear that one of the primary distinctions between the duty of good faith and the duty of care is the mental state required, but acknowledged that there is a large amount of overlap between those two duties as well. *In re Walt Disney*, 906 A.2d at 65 ("The conduct that is the subject of due care may overlap with the conduct that comes within the rubric of good

(continued . . .)

Thus, to adequately discharge her statutory duty of loyalty, the director must subjectively believe her actions are in the best interest of the corporation, and her subjective belief must be objectively reasonable—the reasonable person in those circumstances would likewise believe that the action would be in the best interests of the corporation. *See* MODEL BUS. CORP. ACT § 8.30 cmt. at 8-196 (AM. BAR ASS'N 2013 Revision) ("The phrase 'reasonably believes' is both subjective and objective in character. Its first level of analysis is geared to what the particular director, acting in good faith, actually believes . . . . The second level of analysis is focused specifically on 'reasonably.'").[12] Therefore, to breach (1)(c), the director must take some action that she either knows is not in the best interests of the corporation, or unreasonably or negligently believes is in the best interests of the corporation. Most importantly for this case, if the best interests of the corporation are served by the director's actions then there is no claim under subsection (1)(c).

―――――――――――――――――――――――

(continued . . .)
faith in a psychological sense, but from a legal standpoint those duties are and must remain quite distinct."(footnote omitted)). While explaining this overlap and the distinctions between these duties the court stated that, in some cases, "two states of mind coexist in the same person: subjective bad intent (which would lead to a finding of bad faith) and gross negligence (which would lead to a finding of a breach of the duty of care)." *Id.* at 65 n.104. Thus, there are instances in which a director may breach the duty of care and the duty of good faith through the same conduct. Intentional or willful misconduct requires us to look into the subjective mental state of the director, whereas the URBCA's codification of the duty of care is measured from an objective standard. *See* UTAH CODE § 16-10a-840(1)(b) (director must discharge duties "with the care an ordinarily prudent person in a like position would exercise under similar circumstances").

[12] The URBCA is largely based on the 1984 version of the Model Business Corporation Act. UTAH BUS. CORP. ACT REVISION COMMITTEE, OFFICIAL COMMENTARY TO UTAH REVISED BUS. CORP. ACT 1 (1992). While these comments are based on the 2013 version of the model act, they discuss the "standards of conduct" that have existed since the "1969 Model Act," and are thus informative of the proper interpretation of the standards of conduct under the URBCA. MODEL BUS. CORP. ACT § 8.30 cmt. at 8-193 (AM. BAR. ASS'N 2013 Revision).

*B. Standards of Liability Under Utah Code Section 16-10a-840(4)(b)*

¶20 While Utah Code section 16-10a-840(1) establishes the standards of conduct for officers and directors, Utah Code section 16-10a-840(4)(b) establishes the standards of liability. After establishing that a director or officer has breached a duty under subsection (1), the corporation or shareholder must prove that the duty was breached with any of the mental states noted in subsection (4)(b), that codifies, to some extent, the business judgment rule. Mr. Rawcliffe cites a string of Delaware cases for the proposition that the business judgment rule does not apply to "directoral self-compensation decisions." *See, e.g., Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002). While this may be persuasive authority, and we can see the policy reasons for such a rule, we are bound by the plain language of the URBCA, which does not provide for any exceptions to the application of subsection (4)(b). As noted above, the language of the statute clearly spells out the elements that a corporation or shareholder must establish to hold directors or officers liable for their official acts.

¶21 Subsection (4)(b) provides that a director or officer can be liable for a breach of duty only if "the breach or failure to perform [a duty] constitutes gross negligence, willful misconduct, or intentional infliction of harm on the corporation or the shareholders." UTAH CODE § 16-10a-840(4)(b). A director may breach one of the standards of conduct identified in subsection (1), but can be held liable only if her conduct falls under one of the mental states in subsection (4)(b). Thus, a director may act negligently in violating her duty to act in the best interests of the corporation, but unless her negligence rises to the level of gross negligence, she "is not liable to the corporation [or] its shareholders" for breaching a standard of conduct. *Id*. § 16-10a-840(4).

¶22 The mental states in subsection (4)(b) range from "utter indifference . . . at best [to] a concerted effort to destroy the business at worst." *Wachocki v. Luna*, 2014 UT App 139, ¶ 10, 330 P.3d 717 (footnote omitted). Gross negligence is the minimum standard required to hold a director liable under the URBCA. "[G]ross negligence is 'the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result.'" *Penunuri v. Sundance Partners, Ltd.*,

2017 UT 54, ¶ 35, --- P.3d --- (quoting *Blaisdell v. Dentrix Dental Sys., Inc.*, 2012 UT 37, ¶ 14, 284 P.3d 616).[13]

¶23 While this court has never expressly defined "willful misconduct" in the context of corporate duties, we have defined it in other situations. In the judicial discipline context, we determined that a "wrongful purpose element should be necessary" to find willful misconduct. *In re Worthen*, 926 P.2d 853, 869 (Utah 1996). In the tort context, we held that willful misconduct, under the Limitation of Landowner Liability Act, "incorporates the elements of knowledge of the dangerous condition and of the fact that serious injury is a probable result, and inaction in the face of such knowledge . . . ." *Golding v. Ashley Cent. Irrigation Co.*, 793 P.2d 897, 901 (Utah 1990); *see also Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 335 (Utah 1985) ("Willful misconduct goes beyond gross negligence in that a defendant must be aware that his conduct will probably result in injury."). Thus, the director or officer must take an action or fail to act when she knows that the action or failure to act will likely result in harm to the corporation.

¶24 The final mental state under subsection (4)(b) is the "intentional infliction of harm on the corporation or the shareholders." UTAH CODE § 16-10a-840(4)(b). Under this mental state, not only does the director or officer know that the corporation is likely to be harmed by a certain action, but also that the director or officer's actions are taken with the intent to harm the corporation or its shareholders.

## II. MR. RAWCLIFFE HAS FAILED TO STATE A CLAIM

¶25 Having determined the proper analysis under Utah Code section 16-10a-840, we now turn to Mr. Rawcliffe's complaint to

---

[13] In *Penunuri*, we discussed, without determining, the mental state required for gross negligence. 2017 UT 54, ¶ 38 n.59. We recognized that some authorities, including some of our own precedent, "imply that a plaintiff must prove that a defendant acted with a certain mental state with respect to the risk created. But we have also suggested that gross negligence can be shown even without a 'knowing' state of mind." *Id.* (citations omitted). We do not conclusively address this issue here as it is not necessary to the outcome of this case. Under either standard, we determine that Mr. Rawcliffe has failed to state a claim for relief because he has failed to adequately allege that the Compensation Committee actually harmed the corporation or violated the purposes of the Plan.

determine if he has adequately pled causes of action under this section. Mr. Rawcliffe brought claims against the members of the Compensation Committee for breach of fiduciary duty and waste of corporate assets in authorizing the spring-loaded SSARs, and claims against one other director and several officers for breach of fiduciary duty and unjust enrichment for receiving the spring-loaded SSARs. We first discuss the pleading standard that Mr. Rawcliffe must meet, then review his claims against the members of the Compensation Committee. Finally, we turn to his claims against the other director and corporate officers.

### A. We Apply Utah Rule of Civil Procedure 9(c) to This Case

¶26 The district court held that Utah Rule of Civil Procedure 9(c),[14] requiring a plaintiff to plead fraud with specificity, applied to Mr. Rawcliffe's breach of fiduciary duties claims because "spring-loading sound[s] in fraud." It relied on *State v. Apotex Corp.* for its statement that rule 9(c) "is not limited to allegations of common law fraud," but instead "reach[es] all circumstances where the pleader alleges the kind of misrepresentations, omissions, or other deceptions covered by the term 'fraud' in its *broadest dimension*." 2012 UT 36, ¶ 22, 282 P.3d 66 (citation omitted). Mr. Rawcliffe does not challenge this holding on appeal, so we review his complaint to determine if it "state[s] with particularity the circumstances constituting" breach of fiduciary duty.[15] UTAH R. CIV. P. 9(c). However, "intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id*. Thus, he must allege facts surrounding the actions the Compensation Committee took with particularity, but their intent can be pled generally. While intent

---

[14] The district court actually applied the old Utah Rule of Civil Procedure 9(b), which stated that, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." UTAH R. CIV. P. 9(b) (2015). However, because there is no substantive difference concerning fraud between the old rule 9(b) and the new rule 9(c), we cite the new rule.

[15] We do not hold that the heightened pleading standard in Utah Rule of Civil Procedure 9 applies to breach of fiduciary duty claims. We merely apply that standard because Mr. Rawcliffe waived any argument that his complaint should be subject to the general pleading standard in Utah Rule of Civil Procedure 8.

need only be pled generally, we still "need not accept [as true] extrinsic facts not pleaded nor need we accept legal conclusions in contradiction of the pleaded facts." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 7, 342 P.3d 224 (citation omitted).

### B. Mr. Rawcliffe's Claims Against the Compensation Committee

¶27  At oral argument, Mr. Rawcliffe cited two allegations in his complaint that he argues most strongly show a breach of fiduciary duty by the members of the Compensation Committee and meet the heightened pleading standard. First, the complaint alleges that "the members of the Board's Compensation Committee . . . knowingly and deliberately violated USANA's stockholder-approved equity plan." The allegation that the Compensation Committee violated the Plan is a conclusory statement that we do not assume is true, absent additional allegations supporting it. *See Am. W. Bank Members*, 2014 UT 49, ¶ 7. Second, the complaint alleges that "the Compensation Committee deliberately granted the SSARs . . . [to] ensure that the SSARs carried an artificially low exercise price," and that the committee thereby "improperly violated the Plan by granting awards which they knew would be 'in the money' once the positive news . . . was disclosed the following day." At best, these two allegations combine to allege that the Compensation Committee knowingly and deliberately approved spring-loaded SSARs.

¶28 However, Mr. Rawcliffe conceded on appeal that the Compensation Committee complied with the "strict letter" of the Plan when it authorized the spring-loaded SSARs. He argues only that the Compensation Committee violated "the spirit and intent" of the Plan when they "us[ed] non-public, inside information to manipulate 'fair market value' to benefit themselves." We agree with Mr. Rawcliffe that if, and we emphasize *if*, the directors intended to circumvent the purposes of the Plan to benefit themselves to the detriment of the corporation or its shareholders, even if they complied with the "letter" of the Plan, he has adequately pled a breach of the duty of good faith. However, we do not agree with Mr. Rawcliffe's analysis of what purposes the Plan intended to fulfill, and hold that spring-loading does not, per se, violate those purposes.[16]

---

[16] The Plan was attached to Mr. Rawcliffe's Verified Stockholder Derivative Complaint as Exhibit A. Because it was attached, and was therefore a part of the pleading, we may review it on a motion to dismiss without converting the motion into a motion for summary

(continued . . .)

¶29 The Plan is a document that governs the procedures the Compensation Committee must follow when it authorizes equity incentive awards. We interpret the governing documents of a corporation the same way we interpret a contract. *Dansie v. City of Herriman*, 2006 UT 23, ¶ 6, 134 P.3d 1139 (interpreting articles of incorporation "using the same approach that we apply to the interpretation of contracts generally"). Our purpose in interpreting a contract is to "ascertain the intentions of the parties to the contract." *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 17, 54 P.3d 1139. "In interpreting a contract, [w]e look to the writing itself to ascertain the parties' intentions, and we consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *Id.* ¶ 18 (alterations in original) (internal quotations marks omitted). While interpreting such a document, we look first to "the plain language of its text." *Dansie*, 2006 UT 23, ¶ 6.

¶30 The plain language of the Plan clearly denotes its purposes. First, the Plan defines fair market value as the "mean between the highest and lowest selling price of a share of Common Stock on the principal exchange on which shares of Common Stock are then trading" on the date on which the equity incentive award is announced. If the board of directors and shareholders who approved the Plan intended "fair market value" to mean something different (such as the actual value of the shares based on all non-public information rather than its market value based on its current price on the stock market) they would have stated as much. We cannot read into the Plan a "spirit and intent" that runs counter to what is actually written.

¶31 Additionally, the Plan specifically lays out its purposes. Article I of the Plan provides that its four purposes are to:

> (1) Closely associate the interests of management . . . with the shareholders of the Company by reinforcing the relationship between participants' rewards and shareholder gains;

> (2) Provide management and employees with an equity ownership in the Company commensurate

(continued . . .)
judgment. *See Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶¶ 12–13, 104 P.3d 1226.

with Company performance, as reflected in increased shareholder value;

(3) Maintain competitive compensation levels; and

(4) Provide an incentive to management and employees to remain in continuing employment with the Company and to put forth maximum efforts for the success of its business.

¶32 Article I ends by stating that the Plan is "intended to provide flexibility to the Company in its ability to motivate, attract, and retain the services of members of the Board . . . upon whose judgment, interest, and special effort the successful conduct of the Company's operation is largely dependent." The Plan also gives the Compensation Committee the "exclusive power, authority and discretion to" determine the "number of shares of Stock" that should be issued as an incentive, and the "terms and conditions of any Award . . . including, but not limited to, the exercise price." It is difficult to imagine that such a broadly-worded document intends to completely prohibit spring-loading when it grants the Compensation Committee such large discretion in determining the amount of SSARs that can be awarded. If the Compensation Committee believed that spring-loading would violate the Plan or a standard of conduct under the URBCA, they could have simply awarded themselves and the other defendants a larger number of SSARs to make up the difference in profit from not spring-loading their awards. The "spirit" of the Plan is detailed quite well by the Plan itself, and we cannot say that spring-loading per se violates any of these purposes.

¶33 As spring-loading is not a per se violation of the Plan, the proper question is whether the directors and officers determined, in good faith, that the amount of spring-loaded SSARs and their attendant value met the purposes laid out in Article I. Thus, Mr. Rawcliffe would have to plead facts sufficient to show: 1) that the value of the awards were determined in bad faith or that the value of the awards did not serve the best interests of the corporation, *see supra* ¶¶ 13–19; UTAH CODE § 16-10a-840(1), (4)(a); and 2) that the Compensation Committee approved the awards with the intent to harm the corporation or that they were utterly indifferent to the fact that the awards would harm the corporation, *see supra* ¶¶ 20–24; UTAH CODE § 16-10a-840(4)(b).

¶34 In determining whether the corporation was actually harmed, or that the Compensation Committee intended to harm the corporation, we must look again to the purposes of the Plan. If the

value of the spring-loaded SSARs, or the value of any equity incentive award, meets the purposes laid out in the Plan, then USANA and its shareholders have not been harmed. Indeed, if the purposes of the Plan have been met, then the spring-loaded SSARs have benefited USANA and its shareholders by incentivizing its officers. The shareholder-approved Plan details what the corporation and its shareholders believe is in their best interests. We are bound by the plainly stated purposes of the Plan in determining what is in the corporation's best interests. If the Compensation Committee takes an action that is in the corporation's best interests, then the corporation has not been harmed.

¶35 Mr. Rawcliffe alleges that the awards were "intended to and did line the pockets of the [defendants] at the expense of USANA and its shareholders." But this does not show that the purposes of the Plan were violated. Every compensation decision enriches the recipient at the expense of the company. One of the primary purposes of the Plan is to incentivize directors and officers to stay with the corporation by enriching them. The SSARs clearly met this purpose by 1) increasing the compensation of the directors and officers and 2) maintaining a 23-to-42 month vesting period, thereby incentivizing the directors and officers to stay with the company (so that they could actually exercise the SSARs) and continue to work hard to increase the company's stock price (to make sure the SSARs were "in the money" and to maximize their value).

¶36 Mr. Rawcliffe did not allege that the defendants were over-compensated, just that they received spring-loaded SSARs. Essentially, Mr. Rawcliffe argues that spring-loaded equity incentive awards are a per se violation of the Plan's purposes.[17] We do not

---

[17] Mr. Rawcliffe acknowledged in his brief that he did "not allege that the Directors and Officers were not entitled to receive compensation for their roles at USANA, nor does he allege that the Directors and Officers were not entitle to receive SSARs at all. To the contrary, the Complaint acknowledges that the Plan expressly permits the Compensation Committee to grant ***properly priced*** SSARs and other types of equity awards . . . . What Rawcliffe alleges, however, is that the Directors and Officers were not entitled to receive ***spring-loaded*** SSARs." His only argument that the SSARs were not properly priced is that they were spring-loaded. Thus, he argues that spring-loading is a per se violation of the Plan's purposes.

agree. To meet rule 9(c)'s standard of pleading, Mr. Rawcliffe needed to plead something more to show how these particular awards violated the purposes of the Plan, thereby harming the company.

¶37  We can imagine instances in which spring-loading would be a breach of one of the standards of conduct listed in Utah Code section 16-10a-840(a) and would also be done with a mental state in section 16-10a-840(4)(b) that is required to hold the director liable. As an example, to survive a motion to dismiss, the complaint would have to allege that the Compensation Committee acted in bad faith by awarding spring-loaded SSARs that were not tied to "shareholder gains" or "increased shareholder value," or that they somehow violated other purposes laid out in Article I or inferred from the text of the Plan. The complaint would also have to allege that the Compensation Committee intentionally over-compensated themselves, or that they were utterly indifferent to the fact that they were over-compensating themselves and the other defendants. *See generally* UTAH CODE § 16-10a-840(4)(b).

¶38 However, Mr. Rawcliffe has failed to allege any facts showing that the Compensation Committee did not meet the purposes of the Plan in awarding the spring-loaded SSARs. Additionally, he has not alleged any facts sufficient to show that the Compensation Committee was utterly indifferent or intentionally violated the purposes of the Plan. He simply alleges that the Compensation Committee "knowingly spring-loaded" the SSARs. But incentivizing the directors and officers by awarding them with bonuses is one of the primary purposes of the Plan, so we cannot see how it harmed the corporation absent something more. We affirm the district court's dismissal of Mr. Rawcliffe's breach of fiduciary duty claim against the members of the Compensation Committee.

¶39 Mr. Rawcliffe's claim for corporate waste against the Compensation Committee members is likewise unavailing. While we have mentioned the claim of corporate waste before, we have never actually defined its scope or applied it in a case. *See, e.g., Reedeker v. Salisbury*, 952 P.2d 577, 587 n.11 (Utah Ct. App. 1998) (stating that the parties argued over whether a claim for corporate waste exists in Utah, but the court "need not decide this issue"); *Equitable Life & Cas. Ins. Co. v. Inland Printing Co.*, 484 P.2d 162, 163 (Utah 1971) (saying that "[d]irectors or officers may be liable to the corporation or stockholders for mismanagement of the business of the corporation or waste of its assets" without defining or applying any standard); *Arndt v. First Interstate Bank of Utah, N.A.*, 1999 UT 91, ¶ 18, 991 P.2d 584 (mentioning corporate waste without applying it or addressing its scope).

¶40 On appeal, Mr. Rawcliffe does not argue what the standard should be for a claim of corporate waste. He merely spends a single paragraph making the bald assertion that spring-loaded SSARs are a waste of corporate assets because a Delaware court has said as much. He neither recites the standard for corporate waste in Delaware, nor argues why we should adopt such a standard. "[W]e are not a depository in which the appealing party may dump the burden of argument and research." *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 11, 391 P.3d 196 (citation omitted). This is especially true when the appellant seeks to impose liability under a theory that has not been applied before in this jurisdiction. We hold that Mr. Rawcliffe has failed "to carry [his] burden of persuasion on appeal," and we affirm the district court. *Id.* ¶ 12 (citation omitted).

*C. Mr. Rawcliffe's Claims Against the Other Director and Officers*

¶41 Finally, we dismiss Mr. Rawcliffe's claims against the other defendants who passively received the spring-loaded SSARs. Mr. Rawcliffe brought claims against one director and several officers for breach of fiduciary duty and unjust enrichment. As we have already dismissed his claim for breach of fiduciary duty against the members of the Compensation Committee, who actively approved the SSARs, we cannot see how a director or officer who passively received the SSARs breached a fiduciary duty or violated the "spirit" of the Plan.

¶42 Additionally, we hold that Mr. Rawcliffe has failed to state a claim for unjust enrichment. We cannot see how it is inequitable for the director and officers to retain the benefit of the spring-loaded SSARs. *See Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, ¶ 13, 12 P.3d 580 (Unjust enrichment requires that "the acceptance or retention by the conferee of the benefit [must be] under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." (citation omitted)). According to the facts pled in the complaint, the Compensation Committee approved the spring-loaded SSARs in strict compliance with the "letter" of the Plan, and the spring-loaded SSARs did not violate any of the purposes of the Plan. Unless he were to allege that the director and officers were over-compensated, or that the awards somehow violated the Plan, it is not unjust for the director and officers to keep

their awards.[18] We affirm the district court's dismissal of the remaining defendants in the action.

## CONCLUSION

¶43 The Utah Revised Business Corporation Act establishes when a corporate director or officer may be held liable to the corporation or its shareholders for her official acts. Mr. Rawcliffe has failed to allege sufficient facts to establish any breach of such a duty. We cannot say that spring-loading SSARs constitutes a per se violation of USANA's 2006 Equity Incentive Plan, and Mr. Rawcliffe has failed to allege any facts supporting the inference that the defendants intended to harm, or actually harmed the corporation. We affirm the district court's dismissal of this case without prejudice.

---

[18] We also note that this claim may be barred by Utah Code section 16-10a-840(4), because that section limits director and officer liability. However, neither party made this argument, so we do not address this question.